# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JUSTIN BROWN,

　　*Plaintiff,*

v.

SHERRY BRATTON, *et al.*,

　　*Defendants.*

Civil No.: ELH-19-1450

## MEMORANDUM OPINION

In this race discrimination case, plaintiff Justin Brown, who is African American, has sued his former employer, Caroline County (the "County"),[1] and four of its employees, in their individual and official capacities: Sherry Bratton, the Assistant Director of the Department of Human Resources; Charles Copper, the Director of the Department of Public Works ("DPW"); James Eastland, the Crew Chief at DPW; and Bryan North, the Roads Superintendent at DPW. ECF 1 (the "Complaint"). Plaintiff's suit is predicated on various alleged acts of discrimination, harassment, and retaliation that occurred between 2014, when Mr. Brown joined DPW, and 2019, when he was terminated. He seeks compensatory and punitive damages as well as legal fees.

The Complaint contains fifteen counts.[2] The first eight counts are founded on federal law. Count I alleges "Hostile Work Environment," in violation of the Civil Rights Act of 1991,

---

[1] Defendants aver that the "County Commissioners of Caroline County" is the proper government defendant. ECF 9-1 at 3 n.1. Pursuant to Md. Code (2013 Repl. Vol., 2017 Supp.), § 9-302(a)(2)(ii) of the Local Government Article ("L.G."), Caroline County is classified as a "Code County," and not a "Charter County." In such counties, "county commissioners may sue or be sued." L.G. § 9-404(b). Accordingly, because the proper defendant to this litigation is the County Commissioners of Caroline County, I shall direct the Clerk to substitute it as the defendant in this litigation, in lieu of the County. *See* Fed. R. Civ. P. 21.

[2] The Complaint does not specify what claims are lodged against which defendants.

42 U.S.C. § 1981 *et seq.* ECF 1, ¶¶ 79-89. Count II asserts a hostile work environment claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). ECF 1, ¶¶ 90-100. In Count III, plaintiff alleges "Retaliation," in violation of Title VII. *Id.* ¶¶ 101-13. Count IV lodges a claim for "First Amendment Retaliation," in violation of 42 U.S.C. § 1983. ECF 1, ¶¶ 114-23. Count V alleges a Title VII claim for discrimination on the basis of race. *Id.* ¶¶ 124-32. Counts VI and VII, lodged under § 1983, allege violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution. *Id.* ¶¶ 133-48. Count VIII asserts a "*Monell*" claim, pursuant to § 1983. *Id.* ¶¶ 149-57; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

The remaining seven claims arise under Maryland law. Count IX alleges "Racial Discrimination and Hostile Work Environment," in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code (2014 Repl. Vol., 2017 Supp.), § 20-606 of the State Government Article ("S.G."). ECF 1, ¶¶ 158-66. Counts X and XI allege deprivations of due process and equal protection, in violation of Articles 24 and 26 of the Maryland Declaration of Rights. *Id.* ¶¶ 167-82. Count XII asserts a "*Lontin*[sic]-Type Pattern or Practice" claim. *Id.* ¶¶ 183-87; *see Prince George's Cty. v. Longtin*, 419 Md. 450, 19 A.3d 859 (2011). Counts XIII, XIV, and XV assert common law tort claims of "Negligent, Hiring, Training, Retention & Supervision", "Negligence", and "Gross Negligence." ECF 1, ¶¶ 188-209.

Defendants jointly moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). ECF 9. The motion is supported by a memorandum (ECF 9-1) (collectively, the "Motion") and one exhibit. ECF 9-2. Brown opposes the Motion (ECF 19, "Opposition"), supported by five exhibits. ECF 19-2 to ECF 19-6. Defendants have replied. ECF 20.

No hearing is necessary to resolve the Motion. Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I. Factual Background

The Caroline County Department of Public Works hired Mr. Brown on January 3, 2014, to serve as a Level I Motor Equipment Operator ("MEO I"). ECF 1, ¶ 13. Plaintiff was promoted to a "MEO II" on October 7, 2015. *Id.* ¶ 14. Throughout Mr. Brown's tenure at DPW, he was assigned to the "South Crew," where he was the only African American member. *Id.* ¶ 15.[3]

Mr. Brown alleges that his crew chief, Mr. Eastland, treated him differently than the white members of the South Crew. *Id.* ¶ 17. Mr. Eastland "us[ed] a negative tone towards [Mr. Brown]," and "daily subject[ed] him to unwarranted ridicule and maltreatment." *Id.* ¶ 18; *see id.* ¶ 11. Each morning, when Mr. Eastland issued daily work assignments, he allegedly first provided assignments to the white members, although Mr. Brown held a higher rank than many of the other crew members. *Id.* ¶¶ 20-21. On one occasion, Mr. Eastland refused to give Mr. Brown his assignment, leaving Mr. Brown to linger in the break room. *Id.* ¶ 23. This resulted in Mr. North, a DPW Roads Superintendent, reprimanding Mr. Brown for skipping the morning briefing. *Id.* ¶ 23; *see id.* ¶ 12. Mr. Eastland also allegedly barred Mr. Brown, but not other crew members, from using the front entrance of DPW's facility. *Id.* ¶ 24.

Further, Mr. Brown alleges that on September 29, 2016, he was sent alone to cut tree branches and unclog a ditch, in the rain and in an area with exposed electrical wires. *Id.* ¶ 38. This contravened DPW safety regulations, which requires members to perform jobs in pairs. *Id.* The same day, Mr. Brown allegedly overheard Mr. Eastland say that he was having a bad day and "'did not want to be around any black people.'" *Id.* ¶ 39.

---

[3] Plaintiff did not indicate the number of people assigned to the "South Crew."

Mr. Brown also alleges that he was frequently passed over for overtime opportunities. *Id.* ¶ 25. Pursuant to DPW's seniority policy, Mr. Brown was fourth in line for overtime opportunities. *Id.* ¶ 26. However, Mr. Brown was not contacted when overtime work arose. *Id.* ¶ 25. When Mr. Brown confronted Mr. Eastland about this, Mr. Eastland responded that he had in fact been contacted. *Id.* ¶ 27. Mr. Brown produced phone records to Mr. North demonstrating that Mr. Eastland had never called him regarding overtime work. *Id.* ¶ 28. But, Mr. North "took no action," leading Mr. Eastland to "continue[] to deny Mr. Brown opportunities for overtime." *Id.* ¶ 29; *see id.* ¶ 53 (alleging Mr. Brown was not notified of overtime on May 13, 2017); *id.* ¶ 63 (same for January 8, 2018). Mr. Eastland allegedly "went as far as to order a subordinate specifically not to call Mr. Brown when overtime opportunities arose." *Id.* ¶ 29.

Mr. Brown claims that while he was employed at DPW, he was "regularly subjected to racially offensive and demeaning language." *Id.* ¶ 32. According to Mr. Brown, instances of racially offensive language "were so constant" that it was "an accepted practice within DPW despite complaints made by several employees." *Id.* ¶¶ 36-37. On March 9, 2016, Mr. Brown informed Mr. North that "racist remarks" were being made "regularly" by Caucasian DPW employees. *Id.* ¶ 33. And, he told Mr. North that "[o]ne employee stated that, if his daughter ever dated 'a nigger,' he would kill him." *Id.* However, Mr. North allegedly responded by asking Mr. Brown "what [he] had done to provoke such language from the other employee." *Id.* ¶ 34. Mr. North took no corrective action. *Id.*

Further, Mr. Brown alleges that he was passed over for a promotion, despite being the most qualified DPW employee. Specifically, a MEO III position became available on October 7, 2016. *Id.* ¶ 40. The position required a Class A commercial driver's license, and Mr. Brown was the only applicant who possessed such a license. *Id.* ¶¶ 41-42. Nevertheless, a Caucasian employee

received the position. ECF 1, ¶ 43. Moreover, Mr. Brown's supervisors allegedly made Mr. Brown prepare the white employee for the Class A exam, including driving the applicant to the test. *Id.* ¶ 44.

Mr. Brown also alleges that he was subjected to retaliation for reporting his discriminatory treatment. *Id.* ¶ 46. Mr. Brown claims that after he complained to his supervisors about racially hostile conduct, Mr. Eastland downgraded Mr. Brown during his annual performance review. *Id.* Mr. Brown received ratings of "Meets Expectations" or "Exceeds Expectations" in all categories in his 2015 performance review. *Id.* ¶ 16; *see* ECF 19-3 ("2015 Performance Review").[4] However, during his 2016 performance review, he received a rating of "Needs Improvement" in the fields of "'Follows Directions,' 'Communications,' 'Respect,' and 'Attitude[.]'" ECF 1, ¶ 46; *see* ECF 19-4 ("2016 Performance Review").

In addition, Mr. Brown alleges that he was retaliated against for speaking with Ms. Bratton, the Assistant Director of the County's Department of Human Resources, on February 24, 2017. ECF 1, ¶ 48. During the meeting, Mr. Brown complained that Mr. Eastland "regularly ignored him and refused to give [him] his daily work tasks during morning meetings with the rest of the crew." *Id.* Shortly thereafter, Mr. Eastland ordered Mr. Brown to remove a snowplow from a DPW vehicle by himself, which violated DPW safety regulations. *Id.* ¶ 49. And, on May 3 and 4, 2017, a DPW employee assigned to cut the grass along a road abutting Mr. Brown's family farm left the grass near his property uncut. *Id.* ¶ 50.

---

[4] Although paragraph 16 of the Complaint references the year 2016, plaintiff avers in his Opposition that this was a "typo" and the allegation concerns the 2015 calendar year. ECF 19 at 7 n.11.

On or about May 23, 2017, Mr. Brown submitted a leave slip for the dates of May 26 and 30, 2017, to Richard Kinnamon in lieu of Mr. Eastland, who was absent. ECF 1, ¶ 55.[5] Although Mr. Kinnamon signed the slip in Mr. Brown's presence, Mr. Eastland informed Mr. Brown on May 24, 2017, that he had not received the slip, "leaving [Mr. Brown] vulnerable to workplace discipline." *Id.* ¶ 56. Mr. Brown alleges that Mr. Eastland lied to him, because he later "found" the signed slip "atop" Mr. Eastland's desk. *Id.*

Mr. Brown completed an EEOC Intake Questionnaire on July 14, 2017. ECF 19-5 ("EEOC Questionnaire"). In the EEOC Questionnaire, Mr. Brown checked boxes on the form identifying race and retaliation as the basis for his employment discrimination claim. *Id.* at 2. Mr. Brown also wrote that Mr. Eastland "does not want African Americans in his crew", that he had "been passed up for overtime", and that he had "been passed up for a promotion." *Id.* at 3.

On July 21, 2017, Mr. Brown notified a DPW employee that there was a mattress in the road in the area where he had been assigned to work. ECF 1, ¶ 57. Despite reporting the mattress, Mr. Copper, the DPW Director, issued a disciplinary write-up to plaintiff for failure to notify anyone about the mattress. *Id.*

On August 14, 2017, Mr. North told Mr. Brown to use a truck that Mr. North "claimed he had inspected personally." *Id.* ¶ 58. After driving the vehicle, Mr. Brown noticed a pin missing that holds a lug nut on one of the tires. *Id.* When Mr. Brown returned the truck, the DPW mechanic told him that the vehicle was dangerous to drive, and that he could have been hurt or killed if the tire had separated from the truck. *Id.*

Mr. Eastland ordered Mr. Brown to take a grader out to scrape roads on August 15, 2017. *Id.* ¶ 59. When Mr. Brown told Mr. Eastland that one of the grader's tires was scraped, Mr.

---

[5] The Complaint provides no context for Richard Kinnamon.

Eastland responded that the grader was safe for use. *Id.* However, after taking the grader out as instructed, Mr. Copper called Mr. Brown and ordered him to return the grader because it was unsafe. ECF 1, ¶ 60. Upon his return, Mr. North asked him why he had used the grader and claimed that Mr. Eastland had told Mr. Brown to remain rather than leave. *Id.* ¶ 61.

On August 31, 2017, Mr. Brown filed a Charge of Discrimination with the Maryland Commission on Civil Rights and the EEOC. ECF 9-2 ("EEOC Charge"). Mr. Brown stated, in part, *id.*: "Beginning in January 2014 and continuing to the present, Mr. Eastland has subjected me to disparate treatment regarding daily task assignments and overtime opportunities." And, Mr. Brown complained that he "was denied a promotion to MEO II while Rick Kinnamon (White), MEO II, was promoted to the position despite the fact that I was more qualified." *Id.* Mr. Brown also stated that Mr. Eastland had "frequently" issued him, but not "similarly-situated White crew members," disciplinary write-ups. *Id.*

Plaintiff alleges that, on or about October 17, 2017, Mr. Eastland ordered him to change the blades on a grader by himself, "an activity that is never done alone for safety reasons." ECF 1, ¶ 62. According to Mr. Brown, this was in retaliation for Mr. Brown's past complaints concerning racial discrimination. *Id.*

Mr. Brown injured his right arm and shoulder, including tearing his biceps and rotator cuff, while operating a woodchipper on the job on December 27, 2018. *Id.* ¶ 64. Thereafter, Mr. Brown filed for workers' compensation. *Id.* He was scheduled to undergo surgery on March 18, 2019, but the operation was delayed after blood clots were found in Mr. Brown's right elbow. *Id.* ¶ 65. Mr. Brown met with an individual from the County's Human Resources Department to discuss his health insurance on May 3, 2019. *Id.* ¶ 66. Instead, he was terminated. *Id.*

In the interim, on February 19, 2019, Mr. Brown received a Notice of Right to Sue from the EEOC. *Id.* ¶ 77; ECF 19-6 ("EEOC Letter"). This lawsuit followed on May 16, 2019.

Additional facts are included in the Discussion.

## II. Standards of Review

### A. Rule 12(b)(1)

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); s*ee also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Examiners Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192. Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270). In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

Defendants raise a factual challenge to the Court's subject matter jurisdiction, asserting that the County is entitled to State law "governmental immunity" as to Count XIII, plaintiff's claim for negligent hiring, training, and supervision. ECF 9-1 at 31. Accordingly, the Court may consider evidence outside the pleadings in resolving this issue.

## B. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual

allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the

factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.,* 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire*

*Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted, the Motion is supported by one exhibit, the EEOC Charge. ECF 9-2. The Opposition is supported by five exhibits. ECF 19-2 is an Affidavit submitted by Mr. Brown; ECF 19-3 is Mr. Brown's performance review for the 2015 calendar year; ECF 19-4 is Mr. Brown's 2016 performance review; ECF 19-5 is Mr. Brown's EEOC Questionnaire, dated July 14, 2017; and ECF 19-6 is the EEOC Letter of February 19, 2019.

With respect to Mr. Brown's Affidavit, "[i]t is well-established that parties cannot amend their complaints through briefing or oral advocacy." *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013); *accord Mylan Labs.,*

*Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991), *aff'd*, 2 F.3d 56 (4th Cir. 1993). Thus, I shall not consider Mr. Brown's Affidavit in resolving the Motion.

In contrast, I may consider Mr. Brown's 2015 and 2016 performance reviews, as they are expressly refenced in the Complaint. ECF 1, ¶ 46. And, I may consider the EEOC Questionnaire, the EEOC Charge, and the EEOC Letter, as these documents are referenced in the Complaint and integral to the suit. *See, e.g.*, *Evans v. Md. State Hwy. Admin.*, JKB-18-935, 2018 WL 4733159, at *1 n.1 (D. Md. Oct. 2, 2018) ("Plaintiff's EEOC documents are integral to her complaint and may be considered by this Court because they are a necessary precondition of her right to sue, are explicitly referenced in her complaint, and their authenticity is not disputed.")

### C. Section 1983 Generally

Plaintiff lodges multiple claims under 42 U.S.C. § 1983, including his claims for First Amendment retaliation, violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and *Monell* liability.

Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Nieves v. Barlett*, ___ U.S. ___, 139 S. Ct. 1715, 1721 (2019); *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

**D. Title VII Generally**

Relying on Title VII, plaintiff lodges claims for hostile work environment, retaliation, and race discrimination.

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. The phrase "terms, conditions or privileges of employment" is "an expansive concept." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted). Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding. 42 U.S.C. § 2000e–3; *see e.g.*, *Evans v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F.3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Before filing suit under Title VII, however, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees), *superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray v. Md. Dep't of Transp.*, 662 F. App'x 221, 224 (4th Cir. 2016). To do so, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004). This period is extended to 300 days in a deferral state, such as

Maryland. *See Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *4, n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F, Appx 256 (4th Cir. 2008).

However, exhaustion under Title VII is not jurisdictional. *See Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846, 1850 (2019). Rather, it is a "claim-processing rule[] that must be timely raised to come into play." *Id.* at 1846.

In general, *at trial* a plaintiff "may establish a discrimination claim under Title VII through two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Young v. United Parcel Serv., Inc.*, 569 U.S. 206, 228-29 (2015) (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonnell Douglas* framework).

As indicated, the avenues of proof pertain to trial. At this juncture, reference to these methodologies merely serves to inform a court's evaluation of a motion to dismiss or for summary judgment. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that "a Title VII plaintiff may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnell Douglas Corp*"); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x

158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*").

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

If the plaintiff chooses to proceed *at trial* under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253.

To state a prima facie claim of racial discrimination under *McDonnell Douglas*, the plaintiff must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc.*, Inc., 807 F.3d 619, 626 (4th Cir. 2015)

(quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012)); *see also Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves*, 530 U.S. at 142; *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would

*permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial. See Burns*, 96 F.3d at 731. At the motion to dismiss stage, however, a plaintiff need not establish a prima facie case of discrimination under *McDonell Douglas*. In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." The Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, ___ U.S. ___, 136 S. Ct. 1162 (2016).

However, as the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544. *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309.

On the other hand, in *Twombly*, the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of Twombly is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]" Thus, the question at the motion to dismiss stage is whether the plaintiff has stated "a plausible claim for relief under Title VII . . . ." *Ciociola v. Balt. City Bd. of Sch. Comm'rs*, CCB-15-1451, 2016 WL 125597, at *4 (D. Md. Jan. 12, 2016).

## III. Discussion

Defendants have moved to dismiss all fifteen counts of the Complaint, which they aptly characterize as a "kitchen sink" pleading. ECF 9-1 at 3.[6] They assert that plaintiff has failed to allege plausible violations of federal law. *Id.* at 10-28. And, defendants aver that plaintiff's claims under Maryland law likewise fail because they are coextensive with their federal counterparts. *Id.* at 28-30, 32-33. In addition, defendants contend that the County is immune from plaintiff's claim for negligent hiring, training, and supervision. *Id.* at 31. Further, they maintain that plaintiff's claims against the individual defendants in their official capacity are duplicative of his claims against the County and therefore should be dismissed. *Id.* at 33.

---

[6] The Complaint is a quintessential example of shotgun pleading. Indeed, it seems as if counsel simply rifled through a hornbook and selected every conceivable claim. The burdens imposed by such pleadings on litigants and the judiciary are well documented. *See, e.g., Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 979-80 & n.54 (11th Cir. 2008) (cataloging the negative consequences of shotgun pleading), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

In an Opposition that spans 55 pages and repeatedly parrots the Complaint's allegations, plaintiff defends the viability of each claim. The Court shall proceed to examine the sufficiency of plaintiff's claims on a count-by-count basis so as to separate the wheat from the chaff.

## A. Official Capacity

Plaintiff has sued the County as well as four County employees: Mr. Eastland, Ms. Bratton, Mr. North, and Mr. Copper. They are sued in their individual and official capacities, for violations of federal law. ECF 1, ¶¶ 9-12. The distinction between official capacity and individual capacity suits is an important one.

The Supreme Court has explained that "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). In contrast, official-capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* (citation omitted); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); *Huggins v. Prince George's Cty.*, 683 F.3d 525, 532 (4th Cir. 2012); *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004). The *Graham* Court also said, 473 U.S. at 166: "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." (Emphasis in *Graham*).

To the extent that plaintiff has sued the individual defendants in their official capacity in Counts I through VIII, those claims are needlessly redundant because plaintiff has also sued the County. The County is a proper defendant with respect to plaintiff's claims under 42 U.S.C.

§§ 1981 and 1983 and Title VII. *See* 42 U.S.C. § 2000e(b) (defining an "employer" to include "a person engaged in an industry affecting commerce who has fifteen or more employees"); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that municipal entities may be held liable under § 1983); *accord Fountain v. Anne Arundel Cty. Gov't*, RBD-05-2494, 2007 WL 2413069 (D. Md. Aug. 21, 2007) (assessing the plaintiff's § 1981 and Title VII claims against a county employer).

Therefore, I shall dismiss the federal claims lodged against the individual defendants in their official capacity. *See Love-Lane*, 355 F.3d at 783 ("The district court correctly held that the § 1983 claim against [the defendant] in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative."); *Booth v. Cty. Exec.*, 186 F. Supp. 3d 479, 484 (D. Md. 2016) (dismissing Title VII claims against officer sued in his official capacity, as it was "duplicative of the suit against the County"); *Corral v. Montgomery, Cty.*, 4 F. Supp. 3d 739, 748 (D. Md. 2014) (dismissing First Amendment claim lodged against county police officers because it was "identical" to the claim against the county).

Thus, Counts I through VIII shall be dismissed to the extent that plaintiff seeks to sue the individual defendants in their official capacity.

## B. § 1981 Hostile Work Environment (Count I)

In Count I, plaintiff alleges that he was forced to endure a racially hostile work environment, in violation of 42 U.S.C. § 1981. ECF 1, ¶¶ 79-89. Defendants maintain that plaintiff has not plausibly alleged that any of the individual defendants contributed to a culture of pervasive and severe harassment. ECF 9-1 at 12-15. With respect to the County, defendants assert that the Complaint is devoid of facts "that plausibly suggest that the County had an official employment policy or custom of discriminating against African Americans[.]" *Id.* at 11.

In relevant part, § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). Among other things, "§ 1981 . . . prohibits discrimination in employment on the basis of race." *Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir. 2006); *see Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination . . . on the basis of race."); *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 156 (4th Cir. 2018). This includes a claim for hostile work environment. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373 (2004) (addressing hostile work environment claim brought pursuant to § 1981); *Boyer-Liberto*, 786 F.3d at 277 (same).

Unlike Title VII, Section 1981 allows for individual liability, including against government officials. *Windsor v. Bd. of Educ. of Prince George's Cty.*, TDC-14-2287, 2016 WL 4939294, at *12-14 (D. Md. Sept. 16, 2016) (discussing § 1981); *see, e.g., Satterfiled v. City of Chesapeake*, 2:16cv665, 2017 WL 11449568, at *13-15 (E.D. Va. Aug. 31, 2017) (assessing sufficiency of § 1981 claims lodged against individual municipal defendants). Individuals are liable under § 1981 "when they 'intentionally cause [an employer] to infringe the rights secured by' section 1981." *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 483 (D. Md. 2002) (quoting *Tillman v. Wheaton–Haven Recreation Ass'n*, 517 F.2d 1141, 1145 (4th Cir.1975)), *aff'd sub nom. Skipper v. Giant Food Inc.*, 68 F. App'x 393 (4th Cir. 2003); *accord Tibbs v. Balt. Police Dep't*, RDB-11-1335, 2012 WL 3655564, at *6 (D. Md. Aug. 23, 2012). Similarly, supervisors are liable under § 1981 when they "'authorize, direct or participate in'" a discriminatory act. *Atkins v. Winchester Homes*, CIV CCB-06-278, 2007 WL 269083, at *9 (D. Md. Jan. 17, 2007) (citation omitted).

A hostile environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment[.]'" *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993) (citations omitted). The elements of a hostile work environment claim "are the same under either § 1981 or Title VII." *Spriggs v. Diamond Auto Glass*, 243 F.3d 179, 184 (4th Cir. 2001); *accord Boyer-Liberto*, 786 F.3d at 277.

To state a claim for hostile work environment, a plaintiff must aver that: "(1) he experienced unwelcome harassment; (2) the harassment was based on [the plaintiff's protected status]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Perkins*, 936 F.3d at 207-08 (citing *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003)); *accord Ray*, 909 F.3d at 667; *Irani v. Palmetto Health*, 767 F. App'x 399, 416 (4th Cir. 2019) (per curiam); *Strothers*, 895 F.3d at 328; Boyer-*Liberto*, 786 F.3d at 277.

The first element, unwelcome conduct, "is not a high hurdle." *Strothers*, 895 F.3d at 328. The Fourth Circuit has explained that "an employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer." *Id*. at 328-29. And, "the nature of the conduct may indicate whether or not the conduct is unwelcome." *Id*. at 329.

To satisfy the second element of a hostile work environment claim, the plaintiff must demonstrate that he was harassed or otherwise discriminated against "because of" his protected class. 42 U.S.C. § 2000e–2; *see also Ocheltree v. Scollon Prods., Inc*., 335 F.3d 325, 331 (4th Cir. 2003) (en banc); *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000). The plaintiff

may satisfy this burden by showing that, "but for" his protected class, he would not have suffered discrimination. *Smith*, 202 F.3d at 242. But, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [the plaintiff's protected class], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).

As to the third element of a hostile work environment claim, a hostile work environment exists when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult[.]'" *Boyer-Liberto*, 786 F.3d at 281 (some quotations and citation omitted) (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006)); *see Harris*, 510 U.S. at 21; *Nnadozie*, 730 F. App'x at 158. The Fourth Circuit has stated that the plaintiff must allege that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22).

The "severe or pervasive" requirement has both subjective and objective components. *See Harris*, 510 U.S. at 21-22; *Perkins*, 936 F.3d at 207-08; *Strothers*, 895 F.3d at 331; *EEOC. v. Cent. Wholesalers Inc*., 573 F.3d 167, 175 (4th Cir. 2009). And, "[w]hether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *see Irani*, 767 F. App'x at 416; *Nnadozie*, 730 F. App'x at 158. However, the plaintiff does not need to demonstrate that the work environment is "psychologically injurious." *Boyer-Liberto*, 786 F.3d at 277.

Notably, "viable hostile work environment claims often involve repeated conduct. . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (citation omitted); *see Irani*, 767 F. App'x at 416. But, "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and

conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto*, 786 F.3d at 277 (alterations in original) (citation omitted).

The Court stated in *Perkins*, 936 F.3d at 208: "'[W]hen determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" (Alteration in original) (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008)). "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Perkins*, 936 F.3d at 208 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Likewise, the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment[.]" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted). And, "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *Sunbelt Rentals*, 521 F.3d at 315-16 (internal quotation marks and citations omitted); *see Nnadozie*, 730 F. App'x at 161-62.

Of import here, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Boyer-Liberto*, 786 F.3d at 278 (citation omitted); *see also E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'") (citation omitted); *Jennings v. Univ. of*

*N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

At bottom, the determination as to "severe and pervasive" is not, and "'by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Consequently, "no single factor is dispositive, as the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23, and *Oncale*, 523 U.S. at 81-82) (cleaned up).

Viewing the allegations in the light most favorable to plaintiff, the Complaint states a plausible hostile work environment claim against Mr. Eastland. The Complaint is rife with allegations that Mr. Eastland routinely engaged in "discriminatory intimidation, ridicule, and insult." *Boyer-Liberto*, 786 F.3d at 277. Mr. Eastland allegedly singled out Mr. Brown for ridicule, for example by making Mr. Brown the last crew member to receive daily assignments each morning, ECF 1, ¶ 20-22, and prohibiting him from using the front entrance of the DPW facility. *Id.* ¶ 24. This kind of continuous harassment can amount to a hostile work environment, even in the absence of threats or physical conduct. *See Spriggs*, 242 F.3d at 182-84 (finding that a jury could find that "incessant racial invective" against plaintiff amounted to hostile work environment). Mr. Eastland also allegedly engaged in conduct that made Mr. Brown fear for his safety, including directing Mr. Brown to clear trees near fallen electrical wires, ECF 1, ¶ 39, and ordering plaintiff to remove a snowplow by himself. *Id.* ¶ 49. When Mr. Brown complained of this treatment to Ms. Bratton, Mr. Eastland allegedly sought to intimidate Mr. Brown by giving him a poor performance review. *Id.* ¶ 49.

But, there is more. Mr. Brown alleges that Mr. Eastland repeatedly lied to him and to other DPW employees, effectively "gaslighting" Mr. Brown.[7] For Instance, when Mr. Brown confronted Mr. Eastland as to why he had not been informed of overtime work, Mr. Eastland responded that he had in fact been contracted. *Id.* ¶ 27. Mr. Eastland also allegedly instructed Mr. Brown to use an unsafe grader to scrape roads, but then told Mr. North that he had directed Mr. Brown to remain at DPW. *Id.* ¶ 61. And, Mr. Eastland told Mr. Brown that he had not received Mr. Brown's leave slip, despite the fact that it was on Mr. Eastland's desk. *Id.* ¶¶ 55-56.

Taken as a whole, plaintiff's allegations amount to more than isolated instances of callous behavior or a personality conflict; they paint a picture of a workplace permeated with racial hostility. *Sunbelt Rentals*, 521 F.3d at 315-16 (harassment that was "persistent, demeaning, unrelenting, and widespread" amount to a hostile work environment). That Mr. Eastland was plaintiff's direct supervisor only "exacerbate[s]" the severity of this harassment. *Fairbrook Med. Clinic*, 609 F.3d at 329.

Plaintiff has also adequately alleged the other requirements of a hostile work environment claim. He asserts that the harassment was subjectively severe, as it caused him to "experience anxiety so severe that he was prescribed medication on or about January 5, 2017." ECF 1, ¶ 47. And, plaintiff's allegation that Mr. Eastland said that he "'did not want to be around any black people'" on the day that he ordered Mr. Brown to cut tree branches, *id.* ¶ 39, supports the plausible inference that Mr. Eastland's conduct was motivated by racial animus. Thus, at this juncture,

---

[7] The term is derived from the 1944 film, GASLIGHT. *See* GASLIGHT (Metro-Goldwin-Mayer 1944). "Gaslighting" describes a kind of psychological abuse in which a person denies another person's reality in order to cause that person to second-guess himself and his perceptions. *See What is Gaslighting?*, NAT'L DOMESTIC VIOLENCE HOTLINE (May 29, 2014), https://www.thehotline.org/2014/05/29/what-is-gaslighting/.

plaintiff has stated a plausible claim that Mr. Eastland is personally liable under § 1981 for creating a racially hostile work environment.

Conversely, plaintiff has not pleaded plausible hostile work environment claims against Ms. Bratton, Mr. North, or Mr. Copper. In contrast to Mr. Eastland, these defendants make only cameo appearances in the Complaint. Plaintiff mentions Ms. Bratton just once: Mr. Brown allegedly met with Ms. Bratton on February 24, 2017, regarding Mr. Eastland's treatment. ECF 1, ¶ 48. Similarly, Mr. Copper is only mentioned in one factual averment, for issuing a citation to Mr. Brown. *Id.* ¶ 57. Thus, there are no allegations that either Ms. Bratton or Mr. Copper engaged in unwelcome conduct, such as the use of racial slurs. And, their alleged failure to supervise or stop other DPW employees from harassing Mr. Brown does not give rise to liability. *See, e.g., Mangum v. Town of Holly Springs*, 551 F. Supp. 2d 439, 444 (E.D.N.C. 2008) (ruling that "plaintiff's complaints about defendant's failure to investigate her complaints . . . do not rise to the level of an objectively hostile work environment").

As for Mr. North, plaintiff alleges that he (1) declined to sanction Mr. Eastland upon learning from Mr. Brown that Mr. Eastland had denied him overtime work, ECF 1, ¶ 29; (2) asked Mr. Brown "what [he] had done to provoke [racist] language" from a colleague after Mr. Brown complained to him of racist remarks, *id.* ¶ 34; and (3) told Mr. Brown to use a vehicle that allegedly had a defective tire. *Id.* ¶ 58. Here too, however, these allegations do not show that Mr. North actively "'authorize[d], direct[ed], or participate[d] in' a discriminatory act." *Atkins*, 2007 WL 269083, at *9 (citation omitted).

Plaintiff's § 1981 claim against the County must also be dismissed. In *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), the Supreme Court stated: "We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or

immunities secured by the Constitution and laws,' provides for the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Id.* at 735. Following *Jett*, the Fourth Circuit has instructed that "the § 1983 requirement that plaintiffs show an official policy or custom of discrimination also controls in § 1981 actions against state entities." *Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995); *see also Farmer v. Ramsay*, 43 F. App'x 547, 553 n.8 (4th Cir. 2002) (observing that a plaintiff suing a state or municipal actor "has no cause of action based on § 1981 independent of § 1983"); *Windsor*, 2016 WL 4939294, at *12.

For the reasons discussed, *infra*, plaintiff has not plausibly alleged that the County had an official custom or policy of racial discrimination, in violation of § 1983. Therefore, plaintiff's § 1981 claim against the County is subject to dismissal. *See Lewis v. Robeson Cty.*, 63 F. App'x 134, 138 (4th Cir. 2003) (dismissing § 1981 claim lodged against a municipality where plaintiff had not alleged a plausible § 1983 violation).

Accordingly, I shall grant the Motion as to Count I to the extent it is lodged against Ms. Bratton, Mr. Copper, Mr. North, and the County. But, I shall deny the Motion as to Mr. Eastland.

## C. Title VII Claims (Counts II, III, and V)

Defendants move to dismiss plaintiff's Title VII claim for hostile work environment, asserting that plaintiff failed to exhaust his administrative remedies. ECF 9-1 at 15-17. Defendants contend that plaintiff's Title VII retaliation claim founders because there is no plausible nexus between any protected activity and an adverse action. *Id.* at 18-20. And, defendants maintain that plaintiff's Title VII race discrimination claim is time-barred and, in any event, is implausible. *Id.* at 24-25.

### 1. The Individual Defendants

As a threshold matter, in contrast to § 1981, "supervisors are not liable in their individual capacities for Title VII violations." *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998); *Abeles v. Metro Wash. Airport Auth.*, 676 F. App'x 170, 176-77 (4th Cir. 2017); *accord Spell v. Wright*, RBD-19-722, 2020 WL 247460, at *3 (D. Md. Jan. 16, 2020) (dismissing Title VII claims against employees). Rather, only an employer may be held liable for Title VII violations because individual liability under Title VII "would improperly expand the remedial scheme crafted by Congress." *Lissau*, 159 F.3d at 181.

Therefore, to the extent that plaintiff lodges Counts II, III, and V against the individual defendants in their individual capacity, those claims are subject to dismissal.

### 2. Hostile Work Environment (Count II)

Count II alleges a claim of hostile work environment under Title VII. ECF 1, ¶¶ 90-100. Plaintiff's Title VII hostile work environment claim "must be dismissed," defendants contend, "because Plaintiff did not administratively exhaust this claim." ECF 9-1 at 15. In defendants' view, this claim is foreclosed because plaintiff's EEOC Charge alleges discrimination and retaliation, but makes no mention of a racially hostile work environment. *Id.* at 17.

Mr. Brown counters that a plaintiff need not use magic words in a charge, no less the talisman "hostile work environment" to exhaust such a claim. *See* ECF 19 at 20. Rather, he maintains: "'The touchstone for exhaustion is whether plaintiff's administrative and judicial claims are reasonably related *not precisely the same*.'" *Id.* (emphasis in ECF 19) (quoting *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 595 (4th Cir. 2012)).

As mentioned, a plaintiff must file a charge with the EEOC before filing suit in a federal court under Title VII. 42 U.S.C. § 2000e–5(f)(1) (2006) (permitting civil suits by the "person

claiming to be aggrieved" after the filing of a charge with the EEOC and upon receipt of a right-to-sue letter); *see, e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Puryear v. Cty. of Roanoke*, 214 F.3d 514, 518 (4th Cir. 2000). The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, it "serves twin objectives: protecting agency authority in the administrative process and 'promot[ing] efficiency' in the resolution of claims." *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (alteration in *Stewart*) (quoting *Woodford v. Ngo*, 548 U.S. 81, 89 (2006)); *see also Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 406-07 (4th Cir. 2013).

As noted, the Supreme Court recently held that Title VII's administrative exhaustion requirements are not jurisdictional. *Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846 (2019). Therefore, a plaintiff's failure to exhaust his administrative remedies before filing suit does not itself prevent the court from hearing the case. However, exhaustion is a "claim-processing rule," and it is "'mandatory' in the sense that a court must enforce the rule if a party 'properly raises it.'" *Id.* (cleaned up) (quoting *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam)). Thus, while a defendant may waive arguments related to administrative exhaustion, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6). *See Stewart*, 912 F.3d at 701-02 (holding that Title VII's mandatory 180-day waiting period requirement is a mandatory claim-processing rule and further considering whether dismissal was appropriate under Rule 12(b)(6) for plaintiff's alleged failure to adhere to the rule); *Kenion v. Skanska USA Bldg., Inc.*, RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Davis*).

The requirement of administrative exhaustion limits the scope of a plaintiff's federal lawsuit in that it precludes a plaintiff from asserting claims in litigation that did not appear in his EEOC submission. *Sydnor*, 681 F.3d at 593. Thus, "when the claims in [the] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred." *Parker v. Reema Consul. Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508). For example, "'[a] claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.'" *Nnadozie*, 730 F. App'x at 161 (alterations in *Nnadozie*) (quoting *Chacko*, 429 F.3d at 509).

But, exhaustion does not require that a judicial complaint match the EEOC charge with exactitude. To the contrary, the Fourth Circuit has "recognize[d] that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality[.]" *Balas*, 711 F.3d at 408; *see Sydnor*, 681 F.3d at 594 ("The exhaustion requirement should not become a tripwire for hapless plaintiffs."). Thus, "federal courts may still hear claims that the employee did not raise before the agency, as long as they are 'like or related' and grow out of the allegations during the pendency of the case before the agency." *Stewart*, 912 F.3d at 705 (quoting *Sydnor*, 681 F.3d at 594); *see also Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000) ("If a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit.").

Looking, as I must, to the four corners of the EEOC Charge, *Balas*, 711 F.3d at 407-08, plaintiff's EEOC Charge encompasses his hostile work environment claim. Mr. Brown's EEOC Charge alleged claims of race discrimination and retaliation for engaging in protected activity.

ECF 9-2 at 2. He asserted: "Mr. Eastland has subjected me to daily disparate treatment regarding daily task assignments and overtime opportunities." *Id.* Further, plaintiff alleged that he had "repeatedly complained to management, Human Resources, and the County Commissioners about Mr. Eastland discriminating against [him] due to [his] race[.]" *Id.* Mr. Brown also stated: "Mr. Eastland has frequently written me up but does not write up similarly-situated White crew members." *Id.* And, he averred that since his mother "complained to the County about her grass not being cut . . . . Mr. Eastland's treatment of me has gotten worse." *Id.*

Plaintiff's hostile workplace claim is reasonably related to the allegations in plaintiff's EEOC. This case does not "involve shifting sets and a rotating cast of characters that would have deprived [Defendant] of notice of the allegations against it." *Sydnor*, 681 F.3d at 595 (citing *Chacko*, 429 F.3d at 511). Rather, the crux of plaintiff's complaint is the same in both filings: racially discriminatory conduct by Mr. Eastland. A hostile work environment falls under that umbrella; plaintiff was not required to use any magic words. Indeed, a reasonable administrative investigation would have unearthed the claim because it relies on the same underlying facts alleged in the EEOC Charge. *See Clanton v. City of Va. Beach*, 2:14cv649, 2015 WL 1538198, at *7-8 (E.D. Va. Apr. 3, 2015) (finding plaintiff that alleged sexual harassment in EEOC charge had exhausted her claim for hostile work environment).

Accordingly, I am satisfied that plaintiff exhausted his administrate remedies, and I shall deny the Motion as to Count II.

### 3. Retaliation (Count III)

In Count III, plaintiff alleges that he was subjected to retaliation for reporting racially discriminatory treatment, in violation of Title VII. ECF 1, ¶¶ 101-13. The Complaint identifies three protected activities: (1) reporting racially offensive language to Mr. North on March 9, 2016,

*id.* ¶ 33; (2) meeting with Ms. Bratton on February 24, 2017, to complain about Mr. Eastland's racially discriminatory treatment, *id.* ¶ 109; and (3) filing a complaint with the EEOC. Following these complaints, plaintiff alleges that he forced to remove snowplow blades from vehicles, the grass abutting his family farm was not cut in May 2017, his performance review was downgraded, and he was terminated. *See id.* ¶ 111.

Defendants contend that Mr. Brown's conversations with Mr. North and Ms. Bratton cannot support a plausible retaliation claim because plaintiff suffered no adverse action. ECF 9-1 at 18. Further, they maintain that there is no plausible nexus between any protected activity and plaintiff's termination. ECF 9-1 at 18-19.

To state a claim of retaliation under Title VII, a plaintiff must allege "(1) that she engaged in protected activity, (2) that the employer took a materially adverse action against her and (3) there is a causal connection between the protected activity and the adverse action." *Evans*, 936 F.3d at 195; *see Strothers*, 895 F.3d at 327; *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 F. App'x 146, 151 (4th Cir. 2017); *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005). The plaintiff must establish retaliation, either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster v. Univ. of Md.- E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

As indicated, a plaintiff must first allege that he engaged in protected activity. The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *Navy Fed. Credit Union*, 424 F.3d at 406; *see Netter*, 908 F.3d at 937. "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse

employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Wash. Airport Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

The second element is that of an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.) In a retaliation claim, the standard for an adverse action is more expansive than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Therefore, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Strothers*, 895 F.3d at 327.

However, Title VII does not serve as "'a general civility code for the American workplace.'" *Id.* at 68 (citation omitted). Thus, it "does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68). Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019). Rather, to qualify as a materially adverse action in the retaliation context, the plaintiff must show that the defendant's action "'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern*, 548 U.S. at 68 (citation omitted); *see Evans*, 936 F.3d at 195; *Hoyle*, 650 F.3d at 337. And, "there must be 'some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it.'" *Ray*, 909 F.3d at 670 (quoting *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015)); *see Burlington Northern*, 548 U.S. at 67.

The Fourth Circuit has found that "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). The reassignment of job functions may also constitute an adverse action. *Young v. Montgomery Cty.*, PX-18-2054, 2019 WL 1596992, at *4 (D. Md. Apr. 15, 2019) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998)). But, "[a]bsent evidence that a new position is significantly more stressful than the last, vague allegations of stress resulting from reassignment cannot support a claim of discrimination under Title VII." *Boone*, 178 F.3d at 256. At a minimum, the plaintiff must demonstrate that "the reassignment had some significant detrimental effect on" the employee. *Id.*

To allege the requisite causation under Title VII, the plaintiff must plead that the retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Irani*, 767 F. App'x at 421. In other words, Title VII requires the plaintiff to allege that the "protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362.

Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). Indeed, a lapse of two-and-a-half months between the protected activity and an adverse employment action "is sufficiently long so as to weaken significantly the inference of causation," although it does not preclude the plaintiff from establishing causation. *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003).

Plaintiff's conversation with Mr. North cannot support a retaliation claim because plaintiff has not alleged any subsequent action by Mr. North or others that might dissuade "'a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern*, 548 U.S. at 68 (citation omitted). According to plaintiff, after he complained to Mr. North in March 2016 about racially offensive remarks, he was "subjected to retaliatory downgrades in his annual performance review." ECF 1, ¶ 46. But, plaintiff does not contend that his performance evaluation had a tangible effect on the terms or benefits of his employment at DPW. Moreover, negative performance evaluations, without more, do not rise to the level of an adverse action. *See Jones v. Constellation Energy Projects & Servs. Grp., Inc*., 629 F. App'x 466, 468 (4th Cir. 2015) (per curiam) (declining to find poor performance review constituted an adverse action where the plaintiff failed to show the review changed his employment status or his compensation); *Parsons v. Wynne*, 221 F. App'x 197, 198 (4th Cir. 2007) (stating that defendant's negative performance evaluation would not dissuade a reasonable employee from making or supporting a charge of discrimination); *Smith v. Vilsack*, 832 F. Supp. 2d 573, 583 (D. Md. 2011).

Similarly, Mr. Brown's meeting with Ms. Bratton does not give rise to a plausible retaliation claim. Plaintiff alleges that following the meeting, he was forced to remove a snowplow from a vehicle and, several months later, a DPW employee intentionally left the grass uncut near his family farm. ECF 1, ¶¶ 109-11. Such alleged conduct falls far short of an adverse action. *See Burlington Northern*, 548 U.S. at 68 (recognizing that Title VII's anti-retaliation provision does not extend to "minor annoyances" that often occur in the workplace); *accord Simmington v. Gates*, DKC 08-3169, 2010 WL 1346462, at *13 (D. Md. Mar. 30, 2010) (finding that the incidents complained of would not dissuade a reasonable worker from making or supporting a charge of discrimination because they were "negligibly burdensome"). Moreover, plaintiff does not allege

that he was injured by removing the snowplow or by the uncut grass. *See Burlington Northern*, 548 U.S. at 67 (stating that the anti-retaliation "provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm").

Plaintiff's contention that his termination constitutes retaliation fares no better. To be sure, making an EEOC charge constitutes protected activity under Title VII. 42 U.S.C. § 2000e–3(a); *Laughlin*, 149 F.3d at 259. And, termination is unquestionably an adverse action. *Laughlin*, 149 F.3d at 259; *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 775 (4th Cir. 1997). But, plaintiff has not plausibly alleged a causal connection between the filing of his EEOC Charge and his termination.

Where, as here, there is no direct evidence of causation between any protected activity and any adverse employment action, a plaintiff may show the required causation through temporal proximity. "[E]vidence that the alleged adverse action occurred shortly after the employer became aware of the protected activity is sufficient to satisfy the less onerous burden of making a prima facie case of causation." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (quotation and alterations omitted) (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). But, as noted, a gap of even two-and-a-half months between the protected activity and an adverse action "is sufficiently long so as to weaken significantly the inference of causation," although it is not dispositive. *King*, 328 F.3d at 151 n.5.

Plaintiff submitted his EEOC Questionnaire on July 14, 2017, ECF 19-5, and filed an EEOC Charge on August 31, 2017. ECF 9-2. Yet, he was not terminated until May 3, 2019. ECF 1, ¶ 66. A period of almost two years between the protected conduct and the termination is far too remote to raise an inference of causation between the filing of the EEOC Charge and the termination. *See, e.g.*, *Hooven-Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir. 2001) ("A six month

lag is sufficient to negate any inference of causation."); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (thirteen months negates causation).

Endeavoring to cure this defect, plaintiff contends in his Opposition that the EEOC Letter constitutes a protected activity. ECF 19 at 27 (citing ECF 19-6). In plaintiff's view, the EEOC Letter satisfies Title VII's temporal proximity requirement because the EEOC Letter was issued on February 19, 2019, and the County terminated plaintiff just two months later. *See id.* at 27-28.

This contention is unavailing. First, the County received notice of plaintiff's EEOC activity nearly two years prior, when plaintiff filed his EEOC Charge. *See* 42 U.S.C. §§ 2000e–5(b) (providing that the EEOC shall give an employer notice within ten days of the filing of a charge). Second, the receipt of a Notice of Right to Sue does not qualify as a protected activity because it entails no involvement on the employee's part. *See, e.g.*, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (noting that the plaintiff's contention that a right-to-sue letter is a protected activity is "utterly implausible"); *accord Jones v. Calvert Grp., Ltd.*, DKC-06-2892, 2010 WL 5055790, at *8 (D. Md. Dec. 3, 2010) (declining to treat the issuance of a right-to-sue letter as a protected activity).

Accordingly, dismissal of Count III is appropriate.

### 4. Racial Discrimination (Count V)

In Count V, plaintiff alleges that defendants violated Title VII by failing to promote him and by terminating him on account of his race. ECF 1, ¶¶ 127-30. Defendants contend that plaintiff's failure-to-promote claim is barred by the statute of limitations. ECF 9-1 at 24. With respect to plaintiff's termination, defendants aver: "It is implausible that Plaintiff's May 2019 termination was based upon his race where the only facts he alleges in support of his discrimination claim allegedly occurred in 2016 and 2017." *Id.* at 24-25.

A court may only consider alleged acts of discrimination under Title VII that fall within the applicable limitations period. *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 139 (4th Cir. 2007). As noted, as a prerequisite to filing suit under Title VII, the statute requires that an aggrieved person file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 n.3 (4th Cir. 2002). This period is extended to 300 days in "deferral" jurisdictions such as Maryland. *See Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *4 n.8 (D. Md. Jan. 3, 2018); *Gilbert v. Freshbikes, LLC*, 32 F. Supp. 3d 594, 605 (D. Md. 2014).

"Any discrete acts of discrimination that occurred prior to the applicable period are procedurally barred and cannot be used as a basis for recovery." *Gilliam*, 474 F.3d at 139. This includes discrete acts that are related to acts alleged in timely filed charges. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). However, in such a case, the plaintiff may "us[e] the prior acts as background evidence in support of a timely claim." *Id.*

According to defendants, plaintiff filed a charge with the EEOC on August 31, 2017, and therefore plaintiff' cannot pursue conduct that occurred before November 4, 2016. ECF 9-1 at 24 (citing ECF 9-2). Thus, defendants take the position that plaintiff is barred from pursuing his alleged denial of a promotion to MEO III, which allegedly took place on October 6 or 7, 2017. *Id.* In response, plaintiff cites his EEOC Questionnaire, which is dated July 14, 2017. ECF 19 (citing ECF 19-5).

In determining which form is the operative document for the purpose of Title VII's limitations period, I turn to *Federal Express Corporation v. Holowecki*, 552 U.S. 389 (2008). In that case, the Supreme Court addressed whether an intake questionnaire constituted the filing of a

"charge" for the purpose of the Age Discrimination in Employment Act ("ADEA") if the other filing requirements were met. *Id.* at 395-97. The Court explained that an EEOC intake questionnaire constitutes a charge if it contains "the information required by the [EEOC's] regulations" and it can be "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Id.* at 402. Whether a filing is a request must be determined "from the standpoint of an objective observer." *Id.*

Applying that test, the Court observed that the plaintiff's intake form "contained all of the information outlined in [the EEOC's regulations] including: the employee's name, address, and telephone number, as well as those of her employer; an allegation that she and other employees had been the victims of 'age discrimination'; the number of employees . . . and a statement indicating she had not sought the assistance of any government agency regarding this matter." *Id.* at 404. Further, the plaintiff "gave consent for the agency to disclose her identity to the employer." *Id.* at 406. And, the Court noted that plaintiff also "submitted an affidavit which detailed the allegations against the employer and culminated in a request for the agency 'to please force Federal Express to end their age discrimination.'" *Id.* Thus, the Court found that "the combination of the waiver and respondent's request in the affidavit that the agency 'force' the employer to stop discriminating against her were enough to bring the entire filing within the definition of charge" for the purposes of the ADEA's. *Id.*

The ADEA's exhaustion requirement is quite similar to that for Title VII. *Grice v. Baltimore Cty.*, JFM-07-01701, 2008 WL 4849322, at *4 n.3 (D. Md. Nov. 5. 2008), *aff'd*, 354 F. App'x 742 (4th Cir. 2009). Accordingly, courts have applied *Holowecki* in the context of employment discrimination claims under Title VII. *See, e.g.*, *EEOC v. Phase2 Invs., Inc.*, 310 F.

Supp. 3d 550, 572-73 (D. Md. 2018); *Scott v. Md. Dep't of Pub. Safety and Corr. Servs*., CCB-14-3695, 2015 WL 5836917, at \*4 (D. Md. Oct. 2, 2015); *Bland v. Fairfax Cty*., 799 F. Supp. 2d 609, 615-17 (E.D. Va. 2011).

There is no dispute that plaintiff's EEOC Questionnaire contains the information required by the EEOC's regulations. *See* 29 C.F.R. § 1601.12 (EEOC regulation setting forth what information a "charge" should contain). Plaintiff included his name, address, contact information, employment information, and a statement describing the basis of his complaint for employment discrimination. *See* ECF 19-5. The EEOC Questionnaire also satisfies *Holowecki*'s other requirements. Plaintiff checked the box on his EEOC Questionnaire that states: "I want to file a charge of discrimination . . . ." *Id.* at 6. By doing so, plaintiff acknowledged that the "**EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name**." *Id.* (emphasis in original). Moreover, plaintiff attached an affidavit to his EEOC Questionnaire that set forth specific allegations. *See* ECF 19-5 at 3-4.

In sum, I am satisfied that plaintiff's EEOC Questionnaire is the operative "charge" for the purpose of Title VII's limitations period. *See Lee v. Mattis*, PX-17-2836, 2018 WL 3439261, at \*7 (D. Md. July 17, 2018); *Phase2 Invs., Inc*., 310 F. Supp. 3d at 573; *Scott*, 2015 WL 5836917, at \*4. As noted, plaintiff completed his EEOC Questionnaire on July 14, 2017. ECF 19-5 at 6. Consequently, Mr. Brown's Title VII claims may be based on events that occurred as far back as September 17, 2016. Because October 7, 2016, is within that 300-day window, plaintiff has alleged a timely Title VII claim for the denial of a promotion.

On the merits, however, plaintiff has failed plausibly to allege that he was terminated because of his race. It appears that the Complaint attempts to state a claim for disparate treatment

under *McDonnell Douglas*, alleging that defendants "discharged Plaintiff from his employment after Plaintiff was injured, despite holding positions open for similarly injured white employees in the past." ECF 1, ¶ 129. But, the Complaint does not identify these employees or specify the kinds of injuries they suffered, or when those employees were injured, or how long their jobs were held open. Quite simply, as to plaintiff's claim for unlawful termination, there are not enough facts to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570.

Therefore, I shall deny the Motion as to plaintiff's failure-to-promote claim asserted in Count V. But, I shall grant the Motion as to plaintiff's termination claim, without prejudice.

### D. First Amendment Retaliation (Count IV)

Pursuant to 42 U.S.C. § 1983, Count IV alleges that plaintiff's complaints concerning racial discrimination were "acts of protected speech" and that defendants' "retaliatory actions" violated his First Amendment rights ECF 1, ¶¶ 119, 120. Defendants aver that Count IV warrants dismissal because plaintiff's speech "do[es] not constitute speech on a matter of public concern" and therefore falls outside the ambit of the First Amendment. ECF 9-1 at 22. Further, defendants maintain that even if plaintiff's speech was protected, he has not alleged a sufficiently adverse action. *Id.* at 23.

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend I. Implicit in this guarantee is "the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000); *see also Nieves*, 139 S. Ct. at 1722 ("'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech.") (citation

omitted). Indeed, retaliatory acts are "a potent means of inhibiting speech." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968).

This right extends to public employees. *See id.* at 568; *McClure v. Ports*, 914 F.3d 866, 871 (4th Cir. 2019); *Smith v. Gilchrist*, 749 F.3d 302, 308 (4th Cir. 2014); *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013); *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). Like all citizens, public employees are free to participate in "'debate[s] on matters of public importance,'" which lie "'at the heart of the First Amendment.'" *Smith*, 749 F.3d at 308 (quoting *McVey*, 157 F.3d at 277). Thus, a public employee's speech is protected under the First Amendment if the speech addressed a matter of public concern. *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016); *Smith*, 749 F.3d at 308.

At the same time, the First Amendment rights of public employees are not without limit. The government "'has an interest in regulating the speech of its employees'" in order to "'maintain discipline and ensure harmony as necessary to the operation and mission of its agencies.'" *Smith*, 749 F.3d at 308 (quoting *McVey*, 157 F.3d at 277).

In light of these competing interests, a public employee alleging a First Amendment retaliation claim must satisfy three requirements. First, the court considers "'whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest.'" *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012) (quoting *McVey*, 157 F.3d at 277). "Second, even if the employee spoke upon a matter of public concern, [the court] must determine 'whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest" in managing the working environment.'" *Brooks*, 685 F.3d at 371 (quoting *McVey*, 157 F.3d at 277). "And finally, if the employee's claim satisfies both of these legal criteria, the court turns to the factual question of 'whether the employee's speech was

a substantial factor in the employee's termination decision.'" *Brooks*, 685 F.3d at 371 (quoting *McVey*, 157 F.3d at 277-78).

The parties principally dispute the first element, *i.e.*, whether plaintiff's speech was constitutionally protected. *Compare* ECF 9-1 at 20-21, *with* ECF 19-1 at 30-32. This is a "'threshold question.'" *Brooks*, 685 F.3d at 371 (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)); *see Connick v. Myers*, 461 U.S. 138, 146 (1983). If the employee's speech falls outside the realm of the First Amendment then the court need not scrutinize the reasons for the allegedly adverse action. *Brooks*, 685 F.3d at 371; *Liverman*, 844 F.3d at 407 (noting that if speech "is not protected . . .the inquiry is at an end").

Whether the speech relates to a matter of public concern turns on "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Ordinarily, speech touching on a "matter of political, social, or other concern to the community" constitutes speech on a matter of public concern. *Id.*; *accord Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir. 2007); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004).

By contrast, when speech involves "'matters only of personal interest,'" it is not protected, "in the absence of unusual circumstances." *Grutzmacher v. Howard Cty.*, 851 F.3d 332, 343 (4th Cir. 2017) (quoting *Seemuller v. Fairfax Cty. Sch. Bd.*, 878 F.2d 1578, 1581 (4th Cir. 1989)). Accordingly, "'[p]ersonal grievances [and] complaints about conditions of employment, . . . do not constitute speech about matters of public concern.'" *Campbell*, 483 F.3d at 267 (quoting *Stroman v. Colleton Cty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992)); *see also Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000). Nor do "individualized" internal workplace complaints that are "significant chiefly to the parties involved." *Brooks*, 685 F.3d at 376; *see Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011) (cautioning that speech

made in furtherance of an employment grievance proceeding should rarely be found to constitute public speech).

Plaintiff rests his First Amendment retaliation claim on two statements. First, plaintiff alleges that he reported racist remarks to Mr. North on March 9, 2016. ECF1, ¶¶ 33, 109. Second, plaintiff allegedly met with Ms. Bratton on February 24, 2017, to "complain that Defendant Eastland regularly ignored him and refused to give [him] his daily work tasks during morning meetings with the rest of the crew." *Id.* ¶¶ 48, 109. In addition, plaintiff filed a complaint with the EEOC on July 4, 2017, and the Maryland Civil Rights Commission on August 31, 2017. ECF 9-2; ECF 19-5.

"None of these allegations addresses any public matter." *Brooks*, 685 F.3d at 372. Mr. Brown's statements to Mr. North and Ms. Bratton concern only his conditions of employment and are therefore "purely personal grievance[s]" that cannot support a claim for First Amendment retaliation. *Id.* Mr. Brown's EEOC Questionnaire and EEOC Charge likewise constitute speech on matters of personal interest. *See Guarnieri*, 564 U.S. at 398 ("A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context."); *accord Taylor v. Cty. of Pulaski*, 7:06CV00467, 2008 WL 4533977 (W.D. Va. Oct. 8, 2008) (finding that the plaintiff's EEOC charge did not constitute matters of public concern, since it "overwhelmingly focus[ed] upon the conduct directed against [the plaintiff] and the harm that allegedly resulted to him").

Accordingly, because the Complaint does not plausibly allege any instances of speech on a matter of public concern, plaintiff has failed to state a claim for First Amendment retaliation. Therefore, I shall dismiss Count IV.

## E.  MFEPA Claim (Count IX)

In Count IX, plaintiff lodges a claim under the MFEPA for racially hostile work environment and discrimination.  ECF 1, ¶¶ 158-66.  In defendants' view, this claim is subject to dismissal because it is merely a "re-hashing" of plaintiff's Title VII claims.  ECF 9-1 at 28. Alternatively, defendants contend that because the MFEPA has a two-year statute of limitations, plaintiff cannot recover under the MFEPA for his alleged failure to promote.  *Id.* at 28-29.

The MFEPA "is the state law analogue of Title VII." *Alexander v. Marriott Int'l, Inc.*, RWT-09-02402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011); *see also Haas v. Lockheed Martin Corp.*, 396 Md. 469, 483 n.8, 914 A.2d 735, 743 n.8 (2007).  Maryland courts interpreting MFEPA have often found federal cases arising under Title VII to be persuasive authority. *See, e.g.*, *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011); *Molesworth v. Brandon*, 341 Md. 621, 632–33, 672 A.2d 608, 614 (1996); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494, 578 A.2d 766, 772 (1990); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n.8, 66 A.3d 1152, 1166 n.8 (2013).  Because neither party has asserted a distinction between plaintiff's federal and Maryland discrimination claims, I will apply the same standards to my analysis of both claims.  *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012).

As an initial matter, the MFEPA, like Title VII, does not provide for individual liability. *See Hayes v. Md. Transit Admin.*, RBD-18-0691, 2018 WL 5809681, at *9 (D. Md. Nov. 6, 2018); *Brown v. Balt. Police Dep't*, RBD-11-136, 2011 WL 645366, at *14 (D. MD. Dec. 21, 2011). Therefore, the Motion is granted to the extent that plaintiff has sued the individual defendants under MFEPA.

State statutes of limitations apply to state claims in federal courts.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 (1938). The MFEPA "includes a two-year statute of limitations period."

*Bowen v. Md. Dep't of Pub. Safety and Corr. Servs.*, RDB-17-1571, 2018 WL 1784463, at \*6 (D. Md. April 12, 2018). Under the MFEPA, "a complainant may bring a civil action . . . alleging an unlawful employment practice, if: (1) the complainant initially filed a timely administrative charge . . . ; (2) at least 180 days have elapsed since the filing . . . ; *and* (3) the civil action is filed within 2 years after the alleged unlawful employment practice occurred." S.G. § 20-1013(a) (emphasis added).

As noted, the Supreme Court has held that, in the context of Title VII, "a discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Morgan*, 536 U.S. at 110. Therefore, where a plaintiff fails to file a MFEPA claim within two years of the alleged discrimination or retaliation, the claim is time-barred and must be dismissed. *McCray*, 662 F. App'x at 225 (affirming dismissal of MFEPA claims as untimely because plaintiff did not file the civil suit within two years of her termination). This two-year window applies irrespective of any action by the EEOC. *See Melendez v. Bd. of Ed. for Montgomery Cty.*, DKC-14-3636, 2015 WL 3540947, at \*10 (D. Md. June 3, 2015) (rejecting plaintiff's argument that she did not file because of pending EEOC determination; plaintiff "provide[d] no explanation . . . for why she needed to wait for any EEOC action before pursuing her state law claims").

Here, plaintiff timely filed with the EEOC pursuant to federal law, satisfying the first MFEPA requirement. But, because plaintiff filed suit on May 16, 2019, his MFEPA claim is time-barred as to conduct that occurred before May 16, 2017. It follows that plaintiff cannot pursue a MFEPA claim based on the denial of his promotion to MEO III, because it allegedly occurred around October 6, 2016. ECF 1, ¶¶ 40-42. Therefore, that discrimination claim would be untimely and subject to dismissal.

However, plaintiff contends that his MFEPA claim for hostile work environment is not time-barred because he alleges a course of conduct that qualifies as a continuing violation. ECF 19 (citing *Davenport v. Maryland*, 38 F. Supp. 3d 679, 691 (D. Md. 2014)). Under the continuing violation theory, "[i]f one act in a continuous history of discriminatory conduct falls within the charge filing period, then acts that are plausibly or sufficiently related to that act, which fall outside the filing period, may be considered for purposes of liability." *Lewis v. Norfolk S. Corp.*, 271 F. Supp. 2d 807, 812 (E.D. Va. 2003). The continuing violation theory applies to hostile work environment claims, which are "composed of a series of separate acts that collectively constitute one unlawful employment practice," and are timely if "an[y] act contributing to the claim occur[red] within the filing period." *Morgan*, 536 U.S. at 117 ("It does not matter . . . that some of the component acts of the [claim] fall outside the statutory time period."). The acts that occur within the filing period need not, standing alone, constitute a violation of Title VII for the continuing violation doctrine to apply. *See Gilliam*, 474 F.3d at 141.

The Complaint alleges that Mr. Eastland continuously humiliated and harassed plaintiff between 2014, when plaintiff joined the South Crew, and January 8, 2018, the last allegation concerning Mr. Eastland. ECF 1, ¶ 63. Indeed, plaintiff alleges that on October 17, 2017, Mr. Eastland ordered him to change the blades on the grader by himself, a "dangerous" task that is "never done alone for safety reasons" because of plaintiff's "race and int retaliation for past complaints of race discrimination." *Id.* ¶ 62. Thus, the continuing violation doctrine applies and the Court shall consider allegations that occurred before May 16, 2017, for the purposes of plaintiff's hostile work environment claim. *See Gilliam*, 474 F.3d at 141 (concluding that the continuing violation doctrine applied to supervisor reprimands outside the charge filing period, because plaintiff made allegations of similar reprimands occurring within the filing period);

*Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 411 (D. Md. 2015) (applying continuous violation doctrine to MFEPA hostile work environment claim).

Accordingly, I shall dismiss Count IX to the extent that it lodges a claim of race discrimination based on failure to promote. I shall deny the Motion as to the claim against the County for hostile work environment.

### F. Due Process (Counts VI and X)

Plaintiff alleges a violation of constitutional due process in Count VI. ECF 1, ¶ 137. Count X alleges a violation of plaintiff's due process rights under Articles 24 and 26 of the Maryland Declaration of Rights. *Id.* ¶ 167-75. Defendants argue that plaintiff has failed to state a viable due process claims because he has not plausibly alleged that he had a legitimate claim of entitlement to continued public employment. ECF 9-1 at 26, 29.

The Due Process Clause of the Fourteenth Amendment forbids the government from depriving a person of "life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. It has long been established that the "Due Process Clause[] of the Fourteenth Amendment . . . afford[s] protection to employees who serve the government as well as to those who are served by them, and § 1983 provides a cause of action for all citizens injured by an abridgment of those protections." *Collins v. City of Harker Heights*, 503 U.S. 115, 119-20 (1992). Further, it is well settled that Article 24 is Maryland's constitutional analog to the Due Process Clause of the Fourteenth Amendment, and ordinarily is interpreted *in pari materia* with its federal counterpart. *See, e.g.*, *Doe v. Dep't of Pub. Safety and Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009). Accordingly, and because the federal and State provisions are coextensive, I will analyze together plaintiffs' federal and State due process claims.

The Complaint alleges that defendants deprived plaintiff of his "liberty interest in the right to be secure in his person in the workplace," in violation § 1983 and the Due Process Clause of the Fourteen Amendment to the Constitution. ECF 1, ¶ 137. In the Opposition, plaintiff appears to change horses midstream, arguing that he was deprived of a property interest in his job at DPW. ECF 19 at 39-41. Regardless of the precise contours of plaintiff's due process claim, it fails as a matter of law.

## 1.  Property Interest

"'The root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (emphasis in original) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Loudermill*, 470 U.S. at 542 (citation omitted); *see Bd. of Regents v. Roth*, 408 U.S. 564, 576-77 (1972).

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 579 (1972). "Thus, only where the employee has a legitimate entitlement to continued employment do the requirements of due process attach." *Royster v. Bd. of Trustees*., 774 F.2d 618, 621 (4th Cir. 1985) (citations omitted).

"A government employee 'has a protected property interest in continued public employment only if he can show a legitimate claim of entitlement to his job under state or local law.'" *Andrew v. Clark*, 561 F.3d 261, 269 (4th Cir. 2009) (quoting *Luy v. Balt. Police Dep't*, 326 F. Supp. 2d 682, 689 (D. Md. 2004)). Consequently, "[a] public employee in an at-will position

cannot establish such an entitlement, and thus cannot claim any Fourteenth Amendment due process protection." *Andrew*, 561 F.3d at 269 (quoting *Luy*, 326 F. Supp. 2d at 689-90). However, the Supreme Court has held that an at-will public employee can allege an entitlement to termination "for cause" if he can show the existence of "rules and understandings, promulgated and fostered by state officials" promoting such a procedure. *Perry v. Sindermann*, 408 U.S. 593, 602 (1972).

In this case, there are no allegations that plaintiff possessed a contractual right to continued employment at DPW. Rather, it appears that plaintiff was an at will employee; non-tenured State or local government employees generally serve as at-will employees. *Higginbotham v. Pub. Serv. Comm'n*, 171 Md. App. 254, 267, 909 A.2d 1087, 1094 (2006) (citation omitted). And, under Maryland law, such an employee can be terminated without cause, so long as the discharge does not contravene a clear mandate of public policy. *See, e.g., Molesworth v. Brandon*, 341 Md. 621, 629, 672 A.2d 608, 612 (1996); *Adler v. Am. Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981). The Complaint does not allege with any specificity that the County had implemented rules or policies concerning retention and termination that would lead plaintiff reasonably to believe that he could only be terminated for cause.

In his Opposition, plaintiff directs the Court to contentions in Mr. Brown's Affidavit. But, as noted, "a plaintiff cannot amend his complaint by asserting new facts or exhibits in an opposition to a motion to dismiss." *Lindsey-Grobes v. United Airlines, Inc.*, GJH-14-857, 2014 WL 5298030, *5 (D. Md. Oct. 14, 2014). As such, plaintiff has not stated a viable due process claim for the deprivation of a property interest in regard to his position at DPW.

### 2. Liberty Interest

As discussed, the "standard analysis" under the Due Process Clause is a procedural due process inquiry that asks "whether there exists a liberty or property interest of which a person has

been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). "[S]ubstantive due process is a substantially narrower concept than procedural due process, for it serves as 'an absolute check on certain governmental actions *notwithstanding* the fairness of the procedures' used to implement those actions." *Front Royal & Warren Cty. Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 287-88 (4th Cir. 1998) (citation omitted) (emphasis in Front Royal ). "[T]his absolute check is warranted only where *no* process could cure the deficiencies in the governmental action." *Id.* at 288 (internal citation omitted) (emphasis in original); *See Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 211 (4th Cir. 2019) (cautioning against recognizing new substantive rights).

Of relevance here, one thread of substantive due process case law is directed at executive action. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) (distinguishing between substantive due process analysis for legislative and executive acts). This line of cases posits that "the Due Process Clause was intended to prevent government officials 'from abusing [their] power, or employing it as an instrument of oppression.'" *Id.* at 846 (citations and some internal quotation marks omitted). Notably, "the cognizable level of executive abuse of power [is] that which shocks the conscience." *Id.*; *accord Rosales-Mireles v. United States*, ___ U.S. ___, 138 S. Ct. 1897, 1906 (2018); *Huggins*, 683 F.3d at 535; *Wolf v. Fauquier Cty. Bd. of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009) ("Only abuse of power which 'shocks the conscience' creates a substantive due process violation.") (citation omitted)

"Defining conduct that shocks the conscience does not draw on any traditional standard of liability from tort law but rather refers, as a constitutional construct of substantive due process, to 'conduct intended to injure in some way unjustifiable by any government interest.'" *Slaughter v. Mayor & City Council of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012) (citation omitted); *Waybright v.*

*Frederick Cty.*, 528 F.3d 199, 205 (4th Cir. 2008) ("The shocks-the-conscience test turns on degree of fault."). In the context of a voluntary employment relationship, conduct by the governmental employer that rises to the level of deliberate indifference "would not support a substantive due process violation." *Slaughter*, 682 F.3d at 322. Rather, "in the voluntary employment context," the employee plaintiff must show that the governmental employer defendant "*intended to harm*" its employee in order to "establish a substantive due process violation." *Id.* (emphasis in original).

The Supreme Court has cautioned: "The Due Process Clause 'does not purport to supplant traditional tort law,'" and therefore, it should not "be interpreted to impose federal duties that are analogous to those imposed by state tort law." *Collins*, 503 U.S. at 128 (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986)). Further, the Fourth Circuit has admonished that courts must exercise "self-restraint" and "utmost care," carefully scrutinizing the circumstances "before any abuse of power is condemned as conscience shocking." *Waybright*, 528 F.3d at 205 (internal quotation marks and citations omitted).

Plaintiff's claim fails at the outset because the Complaint contains no allegations that the County intentionally sought to harm him. But, more fundamentally, plaintiff's allegations do not rise to the level of conscience-shocking, inhumane treatment. As the Fourth Circuit has explained, "[c]onduct that shocks the conscience encompasses 'only the most egregious official conduct.'" *Slaughter*, 682 F.3d at 321 (quoting *Lewis*, 523 U.S. at 846). The cases in this realm "typically feature quite extreme governmental wrongdoing." *Waybight*, 528 F.3d at 208; *compare Rochin v. California*, 342 U.S. 165 (1952) (pumping a suspect's stomach to look for drugs violated substantive due process), *with Doe v. Gooden*, 214 F.3d 952, 954-55 (8th Cir. 2000) (declining to find violation of substantive due process where teacher psychologically tormented her classroom of elementary school students because "[v]erbal abuse is normally not a constitutional violation").

Plaintiff's employment discrimination case does not clear this sky-high hurdle. Indeed, the Supreme Court has squarely rejected the contention that the Due Process Clause imposes a constitutional duty on an employer to provide its employees with a safe work environment. *Collins*, 503 U.S. at 128 (labeling this argument as "unprecedented").

In short, plaintiff has not stated a plausible due process claim under federal or State law. Accordingly, Counts VI and XII are subject to dismissal.

## G. Equal Protection (Counts VII and XI)

In Count XI, plaintiff alleges that he was "treated differently than his similarly-situated white counterparts," in violation of § 1983 and the Equal Protection Clause of the Fourteenth Amendment. ECF 1, ¶ 143. Plaintiff alleges the same equal protection violations under the Maryland Declaration of Rights. *See id.* ¶ 177. However, according to defendants, these claims fall short "[f]or all the [same] reasons" that doom plaintiff's Title VII, § 1981 and § 1983 claims. ECF 9-1 at 27; *see id.* at 29.

The Fourteenth Amendment's Equal Protection Clause states: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This guarantee "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Article 24 of the Maryland Declaration of Rights contains the State's constitutional guarantee of equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 41 n.11, 838 A.2d 1225, 1237 n.11 (2003). It "is the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496 (D. Md. 2013) (quotation marks omitted). Thus, Article 24 is ordinarily interpreted *in pari materia* with its federal counterpart. *See Tyler v. City of Coll. Park*, 415 Md. 475, 499-500, 3 A.3d 421, 435 (2010)

(recognizing that Maryland courts "interpret Article 24 *in pari materia* with the Fourteenth Amendment to the United States Constitution"); *see also Littleton v. Swonger*, 502 F. App'x 271, 274 (4th Cir. 2012). In other words, "analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Hawkins*, 955 F. Supp. 2d 474.

To state a claim under § 1983, a plaintiff must: (1) "allege the violation of a right secured by the Constitution and laws of the United States"; and (2) "show that the alleged deprivation was committed by a person acting under color of state law." *West*, 487 U.S. at 48, 108; *see Crosby*, 635 F.3d at 639; *Clark v. Link*, 855 F.2d 156, 161 (4th Cir. 1988). In the employment discrimination context, courts apply the standards developed under Title VII to an equal protection claim asserted under § 1983. *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); accord *Louis v. City of Rockville*, PX-16-1471, 2018 WL 1471681, at *8 (D. Md. Mar. 23, 2018) ("Equal protection discrimination claims brought pursuant to § 1983 proceed under the same framework applicable to Title VII claims.") (citing *Weathersbee v. Balt. City Fire Dep't*, 970 F. Supp. 2d 418, 430 (D. Md. 2013)).

Because plaintiff has stated a plausible § 1981 claim against Mr. Eastland, I shall deny the Motion to the extent that Counts VII and XI are lodged against Mr. Eastland in his personal capacity. And, because plaintiff has adequately pleaded Title VII claims for hostile work environment and racial discrimination, I shall deny the Motion as to Counts VII and XI to the extent the claims are lodged against the County.

## H. Municipal Policy Claims (Counts VIII and XII)

Count VIII lodges a claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). ECF 1, ¶¶ 149-57. In particular, plaintiff alleges that the County "maintained a policy of unconstitutional and unlawful supervision" that effectively blessed racial discrimination against

African American employees. *Id.* ¶ 150. And, in Count XII, plaintiff alleges a violation of *Prince George's County v. Longtin*, 419 Md. 450, 19 A.3d 859 (2011). ECF 1, ¶¶ 183-87. I shall analyze these claims together, because "'*Longtin* claims are essentially Maryland's version of *Monell* claims.'" *Devi v. Prince George's Cty.*, DKC-16-3790, 2017 WL 3592452 at *4 (D. Md. Aug. 21, 2017) (citation omitted).

Defendants assert that plaintiff does not come close to alleging plausible *Monell* or *Longtin* claims. They maintain that the Complaint is devoid of facts concerning other African American DPW employees so as to support the inference that the County maintained racially discriminatory policies or practices. ECF 9-1 at 27-29.

### 1. *Monell* Generally

A municipality is subject to suit under § 1983. *Monell*, 436 U.S. at 690. The Supreme Court determined in *Monell* that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government resulting in a violation of the plaintiff's rights. *Id.* at 690-91. The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). But, liability attaches "only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby*, 388 F.3d at 451; *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___ U.S. ___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan*, 743 F.2d at 229. In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Moore v. Howard Cty. Police Dep't*, CCB-10-1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Notably, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 Fed. App'x at 799. In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a

general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that, to establish a *Monell* claim, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

2.  Analysis

As noted, plaintiff's *Monell* and *Longtin* claims are rooted in the City's alleged "failure to properly train, prosecute, supervise, and discipline Public Works supervisors[.]" ECF 1, ¶ 152*; see also id.* ¶ 184 (alleging County's "failure to establish procedures, rules, orders, guidelines and practices" concerning racial discrimination gives rise to liability under *Longtin*).

When a plaintiff asserts a claim based on inadequate training, the "complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training." *Lewis v. Simms*, AW-11-CV-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014). The *Connick* Court observed, 563 U.S. at 61: "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." (Alteration in *Connick*); *see also Canton*, 489 U.S. at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389.

Notably, even if "a particular officer may be unsatisfactorily trained," that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. Rather, the plaintiff must show that the unsatisfactory training resulted in the constitutional injury at issue. *See id.* at 390-91.

The procedural posture of this case distinguishes it from *Connick v. Thompson*, 563 U.S. 51. Nevertheless, *Connick* is pertinent, as it highlights the challenge a plaintiff faces when seeking to prevail on a failure to train claim.

In *Connick*, respondent Thompson was prosecuted and convicted for attempted armed robbery and murder. *Id.* at 54. However, his convictions were overturned when it was discovered that the prosecution failed to disclose the existence of a certain crime lab report. *Id.* Based on the violation of *Brady v. Maryland*, 373 U.S. 83 (1963), Thompson filed a § 1983 suit against Harry Connick, in his official capacity as the Orleans Parish District Attorney. 563 U.S. 54. He alleged,

*inter alia*, a "deliberate indifference to an obvious need to train prosecutors in his office to avoid such constitutional violations." *Id.* at 57. The district court ruled that, in order to establish deliberate indifference, Thompson was not required to show a pattern of similar *Brady* violations, when he could demonstrate that the need for training was "'so obvious.'" *Id.* at 58. The jury found for Thompson and awarded him damages. *Id.* A divided Fifth Circuit affirmed. *Id.* at 57.

The Supreme Court considered whether a "district attorney's office [could be] held liable under § 1983 for failure to train its prosecutors based on a single *Brady* violation." *Id.* at 54. The Court noted that the *Canton* Court "sought not to foreclose the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Nevertheless, the Court said, *id.* at 61:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, 105 S. Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' "is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

The case of *Peters v. City of Mount Rainier*, GJH-14-00955, 2014 WL 4855032 (D. Md. Sept. 29, 2014), provides guidance. In that case, the plaintiff lodged a § 1983 claim for failure to train the police force. *Id.* at *5. The complaint stated, *id.* (alteration in *Peters*) (quoting the complaint):

> [T]he City maintained an "official policy" of . . . "fail[ing] to properly train and supervise its officers; fail[ing] to implement effective procedures for investigating allegations of police misconduct; fail[ing] to discipline officers who violate the Constitutional rights of private citizens through false arrests, malicious prosecutions, and brutal conduct; and generally fail[ing] to provide safeguards against Constitutional abuses by its overzealous officers."

In considering whether to dismiss the failure to train claim, Judge Hazel highlighted the complaint's failure to allege facts concerning the "'nature of the training'" or "'that the officer's conduct resulted from said training.'" *Id.* at *5 (quoting *Lewis*, 2012 WL 254024, at *1). He noted: "Peters has not even attempted to allege any such facts; instead, he has simply stated in broad, conclusory terms and in a variety of different ways that the City failed to train and supervise its officers." *Id.* (citation to the record omitted). Emphasizing this deficiency, Judge Hazel concluded that the plaintiff's allegation was "nothing more than a bare-bones generalization that a legal element (i.e. the policy[-]or-custom element) is met." *Id.*

That is the case here. The Complaint alleges no facts suggesting a plan, rule, policy, custom, or practice pertaining to the County's human resources training. Indeed, plaintiff does not state how or why the County's training was inadequate or how such inadequacies resulted in the discrimination that plaintiff allegedly experienced. Moreover, plaintiff articulates no allegations of racial discrimination, except those acts pertaining to him, such that County policymakers would have or should have known of the need for better or different anti-discrimination training. In short, the Complaint's conclusory assertions cannot sustain a *Monell* claim premised on a failure-to-train theory.

Plaintiff's *Monell* claim for failure to supervise or discipline is also without merit. To state a claim under *Monell* for failure to supervise or discipline, the plaintiff must allege (1) that the supervisor had "actual or constructive knowledge" that a subordinate was engaged in conduct that "posed a pervasive and unreasonable risk of constitutional injury"; (2) that the supervisor's response to that knowledge "was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) an "affirmative causal link" between the

supervisor's inaction and the plaintiff's alleged constitutional injury. *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Here, the Complaint fails to allege widespread conduct by County employees that could support the inference that County policymakers were aware of and tacitly condoned racial discrimination by failing to discipline DPW employees. Rather, plaintiff focuses on his relationship with Mr. Eastland. And, although plaintiff alleges that he complained to Mr. North and Ms. Bratton, it is not apparent that either Mr. North or Ms. Bratton exert final policymaking authority over personnel decisions. *See Fulmore v. City of Greensboro*, 834 F. Supp. 2d ,396, 407-08 (M.D.N.C. 2011) (dismissing *Monell* claim where plaintiff failed to plausibly allege that defendants were policymakers). Even assuming that they do, "a municipal policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Miligan*, 743 F.2d at 230.

Ultimately, the only allegations in the Complaint concerning an unconstitutional policy, practice, or custom are "[t]hreadbare recitals of the elements of a cause of action[.]" *Iqbal*, 556 U.S. at 678. But, conclusory assertions cannot nudge plaintiff's *Monell* claim "across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. For that reason, I shall dismiss Counts VIII and XII.

## I. Negligent Hiring and Supervision Claim (Count XIII)

In Count XII, plaintiff lodges a claim against the County for negligent hiring, training, retention and supervision. ECF 1, ¶¶188-95. Defendants posit that "governmental immunity" shields the County from Count XII. ECF 9-1 at 31. Further, the defendants argue that plaintiffs' "conclusory" and "scattershot" allegations cannot survive Rule 12(b)(6). *Id.* at 30-31.

Preliminarily, it is helpful to understand the background of the Local Government Torts Claims Act ("LGTCA"), Md. Code (2013 Repl. Vol, 2018 Supp.) §§ 5-301 *et seq.* of the Courts & Judicial Proceedings Article ("C.J."). "With the enactment of the LGTCA, the [Maryland] Legislature sought to provide 'a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.'" *Rios v. Montgomery Cty.*, 157 Md. App. 462, 475-76, 852 A.2d 1005, 1012 (2004) (quoting *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 466 (1995)), *aff'd* 386 Md. 104, 872 A.2d 1 (2005). However, "the LGTCA does not waive governmental immunity or otherwise authorize any actions directly against local governments." *Williams v. Maynard*, 359 Md. 379, 394, 754 A.2d 379, 388 (2000). Rather, local governments are responsible for payment of any judgments. *See* C.J. § 5–303; *Hous. Auth. v. Bennett*, 359 Md. 356, 357-58, 754 A.2d 367, 367-68 (2000) (superseded in part by statute as to other grounds).

C.J. § 5–303(b)(1) provides that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." C.J. § 5–303(b)(1). Section 5–303(b)(2) prohibits a local government from "assert[ing] governmental or sovereign immunity to avoid the duty to defend or indemnify an employee" established in C.J. § 5–303(b)(1). C.J. § 5–303(b)(2). *See Balt. Police Dep't v. Cherkes*, 140 Md, App. 282, 318, 780 A.2d 410, 431 (2001).

C.J. §§ 5–303(d) and (e) expressly reserve the preexisting common law and statutory defenses and immunities of local government employees, and the right of the local government to assert such defenses and immunities, as follows:

(d) Notwithstanding the provisions of [§ 5-303(b),] this subtitle does not waive any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by an employee of a local government.

(e) A local government may assert on its own behalf any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by its employee for whose tortious act or omission the claim against the local government is premised and a local government may only be held liable to the extent that a judgment could have been rendered against such an employee under this subtitle.

"A state's right to governmental immunity is 'deeply ingrained in Maryland law' and may not be waived in the absence of express or implied statutory authorization." *Devi*, 2017 WL 3592452, at *2 (quoting *Nam v. Montgomery Cty.*, 127 Md. App. 172, 182, 732 A.2d 356, 362 (1999)). And, a municipality, such as the County, is also entitled to governmental immunity. *See Nam*, 127 Md. App. at 182, 732 A.2d at 362 ("When the state gives a city or county part of its police power to exercise, the city or county to that extent is the state."). In general, a municipality is "immune from common law tort suits when engaged in governmental, as opposed to proprietary, acts." *Devi*, 2017 WL 3592452, at *2 (citing *Nam*, 127 Md. App. at 182, 732 A.2d at 362; *DiPino v. Davis*, 354 Md. 18, 47, 729 A.2d 354, 369-70 (1999)).

Therefore, the County is immune from liability for the tortious conduct of its DWP employees, including Ms. Bratton, Mr. North, Mr. Eastland, and Mr. Copper. S*ee Gray-Hopkins v. Prince George's Cty.*, 309 F.3d 224, 234 (4th Cir. 2002) ("Under Maryland law, a county 'is immune from liability for tortious conduct committed while the entity was acting in a governmental capacity.'") (quoting *DiPino*, 354 Md. at 47, 729 A.2d at 370).

To be sure, C.J. § 5–303(b) requires the County to indemnify its officers for damages resulting from their own tortious acts. But, the LGTCA does not permit plaintiff to name the County directly in a common law tort suit. *See, e.g.*, *Devi*, 2017 WL 3592452, at *2*; Paulone v.*

*City of Frederick*, 787 F. Supp. 2d 360, 378 (D. Md. 2011); *Martino v. Bell*, 40 F. Supp. 2d 719, 722 (D. Md. 1999).

Therefore, I shall dismiss Count XIII.

### J. Negligence and Gross Negligence Claims (Counts XIV and XV)

Plaintiff alleges in Counts XIV and XV that defendants injured plaintiff while acting negligently or with gross negligence. ECF 1, ¶¶ 196-209. These claims are "doctrinally unsound" and must be dismissed, argue defendants, because the factual allegations in the Complaint allege intentional, not negligent, conduct. ECF 9-1 at 32.

To state a claim of negligence under Maryland law, the plaintiff must allege: (1) "the defendant owed a duty to the plaintiff based on an applicable standard of care"; (2) "breach of that duty"; (3) "causation that relates that breach to the plaintiff's injury"; and (4) "damages." *Armacost v. Davis*, 462 Md. 504, 526, 200 A.3d 859, 872 (2019). Under Maryland law, gross negligence is "'something *more* than simple negligence, and likely more akin to reckless conduct.'" *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007) (emphasis in *Barbe*) (quoting *Taylor v. Harford Cty. Dep't of Soc. Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004)).

Regarding the County, it is immune from plaintiff's negligence and gross negligence claims under the LGTCA for the reasons discussed, *supra*. Plaintiff's claims against the individual defendants fare no better.

"'As a general proposition, if the tortious act is intentional, it may be willful, wanton, or fraudulent, but not negligent.'" *MacDonald v. Costco Wholesale Corp.*, JKB-17-1747, 2018 WL 1583470, at *9 (D. Md. Apr. 2, 2018) (quoting *Wasler v. Resthaven Mem'l Gardens, Inc.*, 98 Md. App. 371, 393, 633 A.2d 466, 476 (1993)). Here, intentional conduct forms the gravamen of

plaintiff's Complaint. Plaintiff alleges that Mr. Eastland "treat[ed] him differently" from Caucasian members of the South Crew "because of his race[.]" ECF 1, ¶ 18. Further, he alleges that, "[b]ut for his race," he would not have been excluded from overtime opportunities, *id.* ¶ 30, subjected to racially offensive language, *id.* ¶ 35, or passed over for a promotion. *Id.* ¶ 45. And, the Complaint states: "Defendants' conduct was intentional, willful, and taken in reckless disregard of the rights of others." *Id.* ¶ 76. Thus, plaintiff's negligence claims are at odds with his allegations.

To be sure, plaintiff is correct that an intentional act can form the basis of a negligence claim. ECF 19 at 53 (citing *Ghassemieh v. Schafer*, 52 Md. App. 31, 42, 447 A.2d 84, 89-90 (1982)). But, that occurs where the intentional act "produces unintended consequences[.]" *Ghassemieh*, 52 Md. App. at 42, 447 A.2d at 89 (finding that the intentional act of pulling away a chair could support a negligence claim). Here, however, plaintiff clearly alleges that defendants acted with the intent to injure him by discriminating against him because he his African-American. Consequently, plaintiff's discrimination claims are the more appropriate vehicle for remedying the conduct alleged in the Complaint. *See Birara v. Kelel*, TDC-17-3241, 2019 WL 3208685, at *6 (D. Md. July 16, 2019) (dismissing negligence and gross negligence claims asserted alongside intentional torts).

Accordingly, the Motion shall be granted as to Counts XIV and XV.

## IV. Conclusion

For the foregoing reasons, I shall GRANT the Motion (ECF 9) in part and DENY it in part. Specifically, the suit is dismissed against Ms. Bratton, Mr. North, and Mr. Copper. I shall dismiss Count I, except to the extent that it is lodged against Mr. Eastland in his individual capacity. And, I shall dismiss Counts III, IV, VI, VIII, X, XII, XIII, XIV, and XV. The Motion is also granted as

to Count V as to Mr. Eastland and with respect to plaintiff's unlawful termination claim. And, I shall dismiss Count IX as to plaintiff's discrimination claim.

In contrast, I shall deny the Motion as to Count I to the extent that it is lodged against Mr. Eastland in his personal capacity. I shall also deny the Motion as to Count II. And, I shall deny the Motion as to Count V, to the extent that it is lodged against the County for failure to promote. Further, I shall deny Counts VII and XI. And, I shall deny the Motion as to Count IX to the extent that it is lodged against the County for hostile work environment.

An Order follows, consistent with this Memorandum Opinion.

Date: February 21, 2020                              _____/s/_____

Ellen L. Hollander
United States District Judge