IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JUSTIN BROWN, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No.: 1:19-cv-01450-JMC |
| SHERRY BRATTON, *et al* | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM OPINION**

This action arises from Plaintiff Justin Brown's allegations of race discrimination against his former employer, Defendant County Commissioners of Caroline County (the "County") and James Eastland, Crew Chief at the Caroline County Department of Public Works ("DPW"). Plaintiff, who is African American, alleged various acts of discrimination, harassment, and retaliation during his course of employment with the County from 2014 to 2019. Plaintiff's remaining claims arise under the Civil Rights Act of 1991, 42 U.S.C. § 1981 *et seq.* (Count I); 42 U.S.C. § 1983 (Count VII); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Counts II; V); Maryland Fair Employment Practices Act ("MFEPA"), Md. Code. (2014 Repl. Vol., 2017 Supp.), State Government Article ("SG") § 20-606 (Count IX); and Articles 24 and 26 of the Maryland Declaration of Rights (Count XI).

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4 (D. Md. 2021). (ECF Nos. 32; 35). Now pending before the Court is Defendants' Motion for Summary Judgment. (ECF No. 47). The Court has considered Defendants' motion, Plaintiff's Opposition thereto, and Defendants' Reply. (ECF Nos. 47, 51,

1

52).  The issues have been fully briefed, and no hearing is necessary.  *See* Loc. R. 105.  For the reasons set forth more fully below, Defendants' Motion for Summary Judgment is GRANTED.

## BACKGROUND

The Caroline County DPW hired Plaintiff as a Level I Motor Equipment Operator ("MEO I") on January 3, 2014.  (ECF No. 47-3 at 6).  As an MEO I, Plaintiff completed various tasks such as cutting grass, digging holes, and picking up trash, tires, and tree limbs.  *Id.* at 8.  Plaintiff was assigned to work in the "South Crew," which handles issues arising in the southern portion of Caroline County.  *Id.*

The County employed Defendant Eastland as the South Crew Leader at the time of Plaintiff's hiring.  *Id*; (ECF No. 47-4 at 4–5).  In this capacity, Defendant Eastland directly supervised all members of the South Crew, which was comprised of approximately seven or eight individuals.  *Id.* at 5.  Aside from Plaintiff, one other South Crew employee—Derrick Brooks—was African American.  (ECF No. 47-3 at 9).  Bryan North, the Road Superintendent, supervised Defendant Eastland.  (ECF Nos. 47-3 at 9; 47-5 at 3).  Charles Copper became the head of DPW shortly after Plaintiff became employed by the County.  (ECF No. 47-3 at 9).

### Overtime Opportunities

As early as 2015, Plaintiff complained that Defendant Eastland did not offer him chances to work overtime, as were offered to other DPW employees.  Plaintiff explained DPW's policy for obtaining overtime opportunities: "MEO Is never really got called.  It was mainly MEO IIs and MEO IIIs and crew leaders."  (ECF No. 47-3 at 16).  "[I]t [also] depend[ed] on where you lived," and an employee's availability when needed.  *Id.*  While Plaintiff could not recall a specific time, Plaintiff complained to Mr. North in 2015 that he was not called for overtime opportunities, while "other people were getting overtime."  (ECF Nos. 47-3 at 16; 47-5 at 18).  Mr. North investigated

2

by speaking with Defendant Eastland, who advised that "he had called" Plaintiff to offer such opportunities, but that Plaintiff "hadn't answered." (ECF No. 47-5 at 18). Plaintiff maintained that Defendant Eastland "hadn't called." *Id.*

Plaintiff offered to show Mr. North his phone records to corroborate his account. (ECF No. 47-5 at 18). As described by Mr. North, Mr. Brown produced "a piece of paper, a single sheet of paper, with a list of phone numbers down the middle of it. . . . That's all it showed." *Id.* Defendant Eastland's phone number did not appear in the list. *Id.* Defendant Eastland then showed Mr. North his phone to rebut Plaintiff's version of events. *Id.* at 19. Mr. North observed "three or four times that [Defendant Eastland's] phone had [Plaintiff's] number . . . where [Defendant Eastland] called [or] tried to call." *Id.* Mr. North could not recall how long the calls lasted, or if Defendant Eastland had left a voicemail, but testified that he "believe[d]" the calls were placed "after normal work hours." *Id.* Faced with this information, Plaintiff again denied ever receiving calls for overtime opportunities from Defendant Eastland. *Id.* Mr. North spoke with Defendant Eastland a final time "and told him, please try to call [Plaintiff] when you can, to use him" when overtime opportunities were presented. *Id.*

### **Application for Promotion**

On October 7, 2015, Plaintiff was promoted to MEO II. (ECF No. 47-3 at 12; 17). Defendant Eastland remained Plaintiff's supervisor. (ECF No. 47-3 at 12). At the same time Plaintiff sought a promotion to MEO II, in October 2015, Plaintiff applied for a promotion to MEO III. (ECF Nos. 47-3 at 27–28; 47-7 at 2–3). Two other individuals also applied for the MEO III position: Richard Kinnamon, who ultimately received the promotion, and Eric Thrift. (ECF Nos. 47-3 at 102; 47-7). The MEO III position required, in pertinent part, the following work experience: "one (1) year to be appointed as Motor Equipment Operator I (MEO I), two years at

the MEO I level to qualify for MEO II[,] and two years at the MEO II level to qualify for MEO III." (ECF No. 47-8 at 3). The MEO III position also required a "Maryland Class 'A' CDL motor vehicle license with endorsements." *Id.*

At the time of the interview process, neither Plaintiff nor Mr. Kinnamon were qualified for a promotion to MEO III. Plaintiff, while he possessed a Class A CDL, did not have the required two years' experience as an MEO II. (ECF No. 47-3 at 28–29). Mr. Kinnamon, who had worked for the County for over thirteen years, did not have a Class A CDL. (ECF No. 47-6 at 11). Ultimately, Mr. Kinnamon was promoted and given six months to obtain a Class A CDL license, which he did. (ECF No. 47-6 at 11–12). Mr. Copper, who made the hiring decision along with Mr. North, explained that Mr. Kinnamon's "[s]eniority made the difference. Color of the skin had nothing to do with the decision . . . ." (ECF No. 47-6 at 12).

**<u>Christopher Peach's March 9, 2016 Remark</u>**

On March 9, 2016, a DPW employee—Christopher Peach—was engaged in a conversation with a fellow DPW employee, Dean Davidson. (ECF No. 47-3 at 21). During the conversation, Mr. Peach remarked to Mr. Davidson something to the effect of, "if my daughter ever dated a 'nigger' . . . he would kill him." (ECF No. 47-3 at 14). Plaintiff, standing approximately ten to fifteen feet away, "knew [Mr. Peach] had said something," because Mr. Davidson "looked right at [Plaintiff] when [Mr.] Peach said something," but Plaintiff "didn't hear the comment." (ECF No. 47-3 at 21–22). Mr. Davidson and other County employees informed Plaintiff that Mr. Peach used "racial slurs," including the March 9, 2016 remark. *Id.* at 13–14.

One day after the remark, Plaintiff reported it to Mr. North. (ECF No. 47-3 at 21). Plaintiff made clear to Mr. North that Mr. Peach's remark made Plaintiff uncomfortable. (ECF No. 47-5 at 10). Mr. North advised that he would talk with Mr. Peach; he also asked Plaintiff what Plaintiff

had done to provoke Mr. Peach.  (ECF No. 47-3 at 22).  Ultimately, Mr. North reported the incident

to Mr. Copper.  (ECF No. 47-5 at 10).  Mr. Copper "questioned [Mr.] Peach about [the incident]."

(ECF No. 47-6 at 7).  During this conversation, Mr. Peach "confirmed that he made the comments,

but [contended that] he wasn't talking to [Plaintiff]," offering instead that "[i]t was a general

conversation between [Mr. Peach] and a couple other guys in his crew.  It was not directed to

[Plaintiff]."  *Id.* at 6.  Mr. Copper "told [Mr. Peach] that [such behavior] will not be tolerated in

the Public Works Department or in Caroline County."  *Id.* at 7.  Mr. Copper further admonished

Mr. Peach by oral reprimand: "I told him nope, I'm not going to tolerate it, and if you do say it

again, you will be punished and everything. . . ."  *Id.*

In addition to the March 9, 2016 remark,[1] Defendant Eastland described another instance

in which Mr. Peach referred to Plaintiff by using offensive language:

> [Defendant Eastland] was in the shop just outside of the office doors and [Mr.]
> Peach came into the shop looking for me because something had happened where
> [Plaintiff[ had angered [Mr. Peach] and [Mr. Peach] came in and he was very upset
> and he used the N word when he was just telling me what happened.

(ECF No. 47-4 at 15).  Mr. Peach's comment "was not directed toward [Plaintiff]," because

Plaintiff "was not present," but Defendant Eastland "understood [that Mr. Peach] was referring"

to Plaintiff.  *Id.* at 16.  Mr. Peach, when asked about this conduct, could not recall "what word [he]

used," but agreed that "if they said it, I must have used it."  (ECF No. 47-9 at 24).

Plaintiff "hardly worked with [Mr.] Peach."  (ECF No. 47-3 at 14).  And, when Plaintiff

was in Mr. Peach's presence, Plaintiff did not hear him make any racist comments.  *Id.*  The two

exchanged pleasantries on occasion, and to Plaintiff, Mr. Peach was cordial.  *Id.*  Indeed, Plaintiff

did not detect that Mr. Peach expressed any type of hostility toward him.  *Id.*

---

[1] The record is not clear as to when Mr. Peach made this remark.

**Defendant Eastland's September 29, 2016 Remark**

On September 29, 2016, Mr. Davidson informed Plaintiff of a remark made by Defendant Eastland.  (ECF No. 47-3 at 24).  Mr. Davidson heard Defendant Eastland say that he "was having a bad day and didn't want to be around black people."  *Id.*  Plaintiff, while originally asserting that he overheard this comment,[2] later confirmed that he was instead, approximately "10 feet away," and "didn't hear the comment."  *Id.* at 24; 26.

Thereafter, Plaintiff maintains that Defendant Eastland sent him "alone . . . to cut tree branches and unclog a ditch in the rain in an area with exposed electrical wires."  (ECF No. 47-3 at 24).[3]  While such a task would be "unsafe," Defendant Eastland clarified that he "sent [Plaintiff] out . . . to look for any problem spots on any of the County roads . . . . [Plaintiff] was to call his supervisor and let the supervisor know" if any such spots were discovered.  (ECF No. 47-6 at 15).  Then, DPW "would send members of the other crew over or a heavy piece of equipment to get the road open."  *Id.*

**December 2016 Human Resources Complaint**

Plaintiff contacted Sherry Bratton, Director of Human Resources on December 22, 2016 to request a meeting.  (ECF No. 47-3 at 30).  Six days later, on December 28, 2016, Ms. Bratton met with Plaintiff, Mr. Copper and Mr. North.  *Id.*  Plaintiff described his issues with Defendant Eastland as "communications issues," "that [Defendant] Eastland [made Plaintiff] work alone," and Defendant Eastland's failure to "give [Plaintiff] adequate instructions for tasks."  *Id.*  Plaintiff

---

[2] Plaintiff alleged in his complaint and in answers to interrogatories that he overheard Defendant Eastland made this remark, before responding at his deposition that Mr. Davidson actually informed him of the incident.  (ECF No. 1) ("[Plaintiff] overheard Defendant Eastland say he was having a bad day and 'did not feel like being around black people.'"); (ECF No. 47-10) ("[Plaintiff] heard Mr. Eastland say that he was 'having a bad day and did not feel like being around any black people.'").

[3] Plaintiff did not testify to as much in his deposition.  Instead, in his Response, Plaintiff quotes a portion of a question asked during his deposition, which simply recites an allegation contained in his Complaint.

did not mention Defendant Eastland's September 29, 2016 remark or that Plaintiff was being denied overtime opportunities. *Id.*

Ms. Bratton confirmed the substance of the meeting: "[Plaintiff] reported that he got his assignments last from [Defendant] Eastland and that [Defendant] Eastland didn't like him." (ECF No. 47-11 at 18). Defendant Eastland also perceived communication issues with Plaintiff. (ECF No. 47-4 at 13). From Defendant Eastland's perspective, "[t]here were times that [Plaintiff] would seem to ignore what I was saying to him. There were other times that he would become combative when I asked him to do something." *Id.* at 13–14. More specifically, "there were times where [Defendant Eastland] tried to give Plaintiff his morning assignments and he would be using his phone or reading a paper and wouldn't even bother to look up at me to acknowledge that I was talking to him." *Id.* at 14. Or, "[t]here were other times that [Defendant] Eastland would go to approach [Plaintiff] in the yard to try to talk to him and he would just turn and walk the other way." *Id.* At the meeting, Plaintiff did not mention Defendant Eastland's September 29, 2016 remark or being denied overtime opportunities. *Id.*

Beginning in January 2017, Human Resources instituted regular Friday meetings for Plaintiff, Mr. North, and Mr. Eastland. (ECF No. 47-3 at 31). Additionally, Mr. Eastland began giving Plaintiff work assignments first in the morning. *Id.* However, this arrangement "didn't end up working out," according to Defendant Eastland, "because [Plaintiff] wasn't always the first one in the room and it just really didn't make sense to necessarily wait around for him to come in when there was [(sic)] people already there waiting for their assignment." (ECF No. 47-4 at 25). This arrangement remained in place for roughly one month. (ECF No. 47-3 at 31).

**Equipment Issues**

On January 25, 2017, Defendant Eastland assigned Plaintiff to operate a new "grader" for the purpose of "scraping roads." (ECF No. 47-3 at 33–34). Plaintiff noticed that "two areas" of the grader's tires were bulging. *Id.* at 34. Plaintiff reported the grader's condition to Defendant Eastland because Plaintiff "knew this to be unsafe from his training" and knew the grader "shouldn't be" driven in such a condition. *Id.* at 33–34. Defendant Eastland, in turn, told DPW Mechanic Richard Breeding. *Id.* at 34. Mr. Breeding advised Defendant Eastland that the grader was safe to operate; Defendant Eastland then instructed Plaintiff to take the grader and start scraping roads. *Id.* Plaintiff drove the machine approximately 20 to 25 minutes from the DPW facility. *Id.* However, Mr. Copper contacted Plaintiff and directed him to return to the DPW facility with the grader before Plaintiff could begin scraping. *Id.* A similar series of events unfolded again on August 16, 2017. *Id.* at 37.

On February 24, 2017, Defendant Eastland directed Plaintiff "[t]o take [a] plow off the grader and sen[d it] down" to "Nagel Farm Service[,] where [DPW] parked several pieces of equipment." (ECF No. 47-3 at 35). DPW employees "don't ever take plows off" of equipment alone for safety. *Id.* For this reason, Defendant Eastland said to Plaintiff, "I will be there to help you." *Id.* Approximately two hours passed, and Defendant Eastland still had not arrived. *Id.* Plaintiff radioed Defendant Eastland, who advised that he was on the way. *Id.* Instead of waiting for Defendant Eastland to arrive, which he eventually did, Plaintiff removed the plow with the assistance of a Nagel's employee. *Id.*

Defendant Eastland directed Plaintiff to "[c]hange the grader blades," on October 17, 2017. (ECF No. 47-3 at 37). Such a task is ordinarily completed by two people, and is regarded by Plaintiff as "a mechanic's job," but Plaintiff nevertheless set out to change the blades. *Id.* Plaintiff

asked Mr. Breeding if he could change the grader blades, who in turn gave Plaintiff equipment needed to complete the task. *Id.* Plaintiff did not ask Mr. Breeding for assistance. *Id.* However, Ben Sommers observed Plaintiff changing the blades and stopped to help Plaintiff. *Id.*

**EEOC Charge and Termination**

Plaintiff filed a formal charge of discrimination with the United States Equal Opportunity Commission ("EEOC") on August 31, 2017. (ECF No. 47-16 at 2). After a workplace injury in 2018, Plaintiff was terminated from the County on May 7, 2019. (ECF No. 47-17 at 2). Plaintiff brought the instant action on May 16, 2019. (ECF No. 1).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party can do so by demonstrating the absence of any genuine dispute of material fact or by showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). The court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)).

However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"  *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences.  *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

## DISCUSSION

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Similarly, Section 1981 can also "serve as the basis for bringing employment discrimination claims," as that section states in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .'"  *Morrow v. Farrell*, 187 F. Supp. 2d 548, 553–54 (D. Md. 2002) (citing 42 U.S.C. § 1981(a)).

Generally, at trial, a plaintiff may establish discrimination under Title VII through two distinct means:

> The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'"  The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) [("*McDonell Douglas*")].

> * * *

> As indicated, these avenues of proof pertain to trial.  At this juncture, reference to these methodologies merely serves to inform a court's evaluation of a motion for summary judgment. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that a Title VII plaintiff may avoid summary

judgment by proceeding under the framework established in *McDonnell Douglas Corp.*); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*").

*Angelini v. Baltimore Police Dep't.*, 464 F. Supp. 3d 756, 777–78 (D. Md. 2020) (internal citations omitted). As originally set out by the Supreme Court, *McDonnell Douglas* established a three-step burden-shifting approach where

the plaintiff-employee must first prove a prima facie case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the prima facie case drops out of the picture and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

*Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 862 (D. Md. 2004) (citing *Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir.2004)). Despite the burden-shifting nature of this process, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Angelini*, 464 F. Supp. 3d at 778.

**A.      Hostile Work Environment (Counts I, II and IX)**

Plaintiff's hostile work environment claims arising under 42 U.S.C. § 1981 (Count I against Defendant Eastland), Title VII (Count II against the County), and the MFEPA (Count IX against the County) are governed by the same analytical framework employed in Title VII hostile work environment claims. *See Proa v. NRT Mid Atlantic, Inc.*, 618 F. Supp. 2d 447, 461 (D. Md. 2009) ("Although Title VII and § 1981 claims rest on distinct legal theories, ordinarily, courts apply the same analyses, including the now traditional four-pronged-prima-facie-case, burden-shifting regime of [*McDonnell Douglas*] to employment-based claims under both theories."); *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 849 (D. Md. 2015) (citation omitted) (concluding that because the MFEPA is the Maryland "state law analogue of Title VII," Plaintiff's

claims arising under MFEPA are "guided by federal cases interpreting Title VII"); *Tibbs v. Baltimore City Police Dep't*, Civ. No. RDB-11-1335, 2012 WL 3655564, at *3 (D. Md. Aug. 23, 2012) (citing *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004)) ("The same analysis applies to race discrimination and retaliation claims under both Title VII and Section 1981.").

The Fourth Circuit recently reiterated the traditional four-pronged test that is used to analyze a Plaintiff's claims of hostile work environment in *Perkins v. International Paper Company*, 936 F.3d 196 (4th Cir. 2019).   To establish a *prima facie* claim of hostile work environment based on race under Title VII, a Plaintiff must demonstrate the following:

> (1) he experienced unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.

*Perkins*, 936 F.3d at 207–08 (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)).   "Whether an environment is hostile or abusive must be determined by evaluating the totality of the circumstances."   *Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 774 (D. Md. 2010) (citation omitted).   Mindful of these principles, the Court will address each factor in turn.

### 1.   Unwelcome Harassment

"The first element of a hostile environment claim, unwelcome conduct, is not a high hurdle."   *Strothers v. City of Laurel*, 985 F.3d 317, 328 (4th Cir. 2018).   To establish "unwelcome conduct," a plaintiff may voice an objection to the employer or alleged harasser.   *Id.* at 328–29 (collecting cases).   While "[t]he alleged conduct need not be severe [under this prong of the

analysis] . . . the nature of the conduct may indicate whether or not the conduct is unwelcome." *Id.* at 329 (citing *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008)).

Plaintiff easily satisfies the "unwelcome harassment" prong.  On more than one occasion, Plaintiff voiced an objection to the conduct he experienced.  First, in March 2016, Plaintiff verbally complained of Mr. Peach's March 9, 2016 remark one day after the occurrence by reporting it to Mr. North.  (ECF No. 47-3 at 21).  Plaintiff told Mr. North that the remark made Plaintiff uncomfortable.  (ECF No. 47-5 at 10).  In turn, Mr. North further reported the incident to Mr. Copper.  (ECF No. 47-5 at 10).  Second, in December 2016, Plaintiff requested a meeting with Human Resources wherein Plaintiff described his issues with Defendant Eastland's conduct, including "that [Defendant] Eastland [made Plaintiff] work alone," and Defendant Eastland failed to "give [Plaintiff] adequate instructions for tasks."  (ECF No. 47-3 at 30).  Therefore, because Plaintiff raised the issue to his supervisors and Human Resources, he has overcome the first hurdle, and "sufficiently alleged that [the perceived] harassment was unwelcome."  *Sunbelt Rentals*, 521 F.3d at 314 (quoting *Smith v. First Union Nat'l Bank*, 202 F. 3d 234, 242 (4th Cir. 2000)).

2.   <u>Based on Race</u>

Plaintiff must next demonstrate that the harassment was based on his race.  This element is derived directly from Title VII's prohibition on "discriminat[ion] . . . because of [an] individual's race."  42 U.S.C. § 2000e-2(a)(1).  The analysis under this prong is akin to "but for" causation.  *See Smith*, 202 F.3d at 242 (citation omitted) ("An employee is harassed or otherwise discriminated against 'because of' his or her gender if, 'but for' the employee's gender, he or she would not have been the victim of the discrimination.").  Put another way, to survive summary

judgment, Plaintiff must adduce sufficient evidence to show that the harassment "was motivated by [racial] animosity." *Sunbelt Rentals*, 521 F.3d at 314 (citation omitted).

Plaintiff has not produced sufficient evidence to show that the vast majority of the alleged harassment was based on his race. More specifically, Plaintiff has failed to carry his burden in establishing that, *because of* his race, he (1) was not offered overtime opportunities by Defendant Eastland; (2) was not promoted to the MEO III position; (3) was forced to work with unsafe equipment; (4) was directed to singlehandedly complete dangerous tasks ordinarily reserved for two people; and (5) received his work assignments last. The record is replete with Plaintiff's "subjective and speculative belief" that Defendant Eastland's conduct was racially motivated; however, this falls short of showing that the harassment was motivated by racial animus. *Puckett v. City of Portsmouth*, 391 F. Supp. 2d 423, 436 (E.D. Va. 2005); *see also Mackey v. Shalala*, 360 F.3d 463, 470–71 (4th Cir. 2004) ("A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination."). Instead, as Plaintiff made clear in the December 2016 meeting with Human Resources, Plaintiff himself attributed much of Defendant Eastland's conduct to "communication issues" and the fact that Defendant Eastland "didn't like him." (ECF Nos. 47-3 at 30; 47-11 at 18). Plaintiff similarly fails to draw a connection to Defendant Eastland's post-2016 conduct and Plaintiff's race. Thus, informed by *McDonnell Douglas*, it becomes clear that Plaintiff has not established a *prima facie* case of discrimination by a preponderance of the evidence based on Defendant Eastland's conduct.

Even if the Court were to assume, which it does not, that Plaintiff adequately made out a *prima facie* case that Defendant Eastland's conduct in the above-enumerated instances was because of Plaintiff's race, Defendants have overwhelmingly provided "legitimate, non-discriminatory reason[s] for its employment action[s]." Taking each of Plaintiff's allegations in

turn, Defendants responded by providing legitimate explanations for the employment action or showing that the particular form of alleged harassment did not occur as Plaintiff alleged.

In response to Plaintiff's assertion that he was not contacted for overtime opportunities, Defendant Eastland testified that he either attempted to contact Plaintiff, and Plaintiff was not responsive, or that Plaintiff lived too far from the location where overtime work existed.  (ECF No. 47-5 at 18).  As it pertains to the promotion Plaintiff sought to the MEO III position, he was not qualified under the published specifications because he did not have the requisite "two years [experience] at the MEO II level to qualify for MEO III."  (ECF No. 47-8 at 3).  Another applicant, who *did* have that experience and could obtain the necessary licensure, received the promotion instead.  (ECF No. 47-6 at 11–12).  Third, Plaintiff used unsafe equipment—i.e., the grader with bulging tires—after Mr. Breeding advised that it was safe.  (ECF No. 47-3 at 34).  Shortly thereafter, Mr. Copper instructed Plaintiff to return it.  *Id.*  Plaintiff testified at his deposition that Defendant Eastland did *not* instruct him to complete a two-person job alone; instead, it became clear that Plaintiff simply tired of waiting for assistance to arrive and began to complete the work himself.  (ECF No. 47-3 at 35).  Finally, Defendant Eastland assigned work to crew members as they came to him.  Plaintiff, because of communication issues with Defendant Eastland, or because he was somehow preoccupied, regularly received his assignments last.  (ECF Nos. 47-3 at 30; 47-4 at 13).

Still, Plaintiff offers no explanation as to how any of these explanations could be pretext for discrimination.  Thus, the Court concludes, with respect to Defendant Eastland's conduct, that Plaintiff has failed to adduce sufficient evidence demonstrating that the conduct occurred "because of" his race.

Nevertheless, the Court concludes that Mr. Peach's March 9, 2016 remark—"if my daughter ever dated a 'nigger' . . . he would kill him,"—and Defendant Eastland's September 29, 2016 remark that he "didn't want to be around black people," viewed in a light most favorable to Plaintiff, constitutes the sort of "direct proof" of discrimination necessary to satisfy the second element at this juncture.  (ECF No. 47-3 at 14; 24).  Thus, the Court proceeds to the third element.

3.    Severe or Pervasive

"To establish that race-based harassment was sufficiently severe or pervasive under Title VII, [Plaintiff] 'must show that a reasonable jury could find that the . . . race-based harassment was so severe or pervasive as to alter the conditions of [Plaintiff's] employment and create an abusive or hostile atmosphere.'"  *Perkins*, 936 F.3d at 208 (quoting *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009)).  This element in the inquiry has both an objective and subjective component.  *Cent. Wholesalers, Inc.*, 573 F.3d at 175.  As to the former, whether an environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position."  *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 158 (4th Cir. 2018) (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc)).  To survive summary judgment, Plaintiff must establish that a reasonable person would perceive, as Plaintiff perceived, an abusive or hostile environment.  *Id.*

To aid in this analysis, the Supreme Court has set out a series of factors for consideration. They include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Perkins*, 936 F.3d at 208; *Sunbelt Rentals*, 521 F.3d at 315.  In all, courts "must examine the

totality of the circumstances," in "assessing whether the harassment is objectively abusive." *Strothers*, 895 F.3d at 331.

The "severe or pervasive" prong serves to winnow the proverbial wheat—i.e., meritorious claims of a hostile work environment—from the chaff. The Fourth Circuit recently elaborated on this point, and it is worth reiterating here:

> [P]laintiffs must clear a high bar in order to satisfy the [objective] severe or pervasive test. [I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. [R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII.
>
> The Supreme Court has also reinforced the steep requirements of a hostile work environment claim. [S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. The mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII. The standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.

*Perkins*, 936 F.3d at 208 (quotation marks and citations omitted).

Viewing the totality of the circumstances in a light most favorable to Plaintiff, Plaintiff demonstrably fails to clear the "high bar" set by the objective aspect of the "severe or pervasive" test. *Sunbelt*, 521 F.3d at 315. To begin, there is but one lone instance of discriminatory conduct supported by admissible evidence and shown to be based on race—i.e., the March 9, 2016 Peach remark. This lends itself to a finding that the discriminatory conduct was *infrequent*. To be clear, Mr. Peach's second use of the word "nigger," in apparent reference to Plaintiff, does not weigh heavily in the hostile work environment analysis. Plaintiff does not argue, and the record does not support, that Plaintiff was present or heard Mr. Peach make the comment. The record does not

even give an indication as to how or when Plaintiff learned of the comment, or what effect same had on Plaintiff's work environment.

Defendant Eastland's comment that he "didn't want to be around black people," is of little value because the record contains no admissible evidence to support it.  And, Plaintiff did not personally hear this comment, either.  Instead, Plaintiff testified in his deposition that Mr. Davidson told Plaintiff of the comment after the fact.  *Perkins* instructs that "evidence of racially offensive conduct that [Plaintiff] heard about second-hand should not be disregarded simply because he did not witness it."  936 F.3d at 210.  Still, even if the Court were to credit all three of these isolated incidents over Plaintiff's five-year tenure, such evidence does not create a genuine issue of material fact because the statements are temporally remote.  *Id*; *Belton v. City of Charlotte*, 175 F. App'x 641, 656 (4th Cir. 2006) (concluding that limited instances of racial discrimination— one involving the word "nigger"—were temporally remote and therefore not severe or pervasive). The March 9, 2016 and September 29, 2016 remarks are separated by more than six intervening months.

Moreover, the March 9, 2016 Peach remark constitutes "second-hand harassment, [which] although relevant, is less objectively abusive than harassment directed only at the plaintiff." *Sraver v. Surgical Monitoring Servs., Inc.*, Civ. No. CCB-05-1331, 2006 WL 2190727, at *5 (D. Md. July 27, 2006) (citing *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753–54 (4th Cir. 1996)); *see also Brown v. Housing Auth. of Calvert Cty.*, 150 F. Supp. 2d 856, 863 (D. Md. 2001) (citation omitted) ("'[S]econd hand harassment'" is obviously not as great as the impact of harassment directed at the plaintiff.").  As recounted earlier, Mr. Peach made the March 9, 2016 remark to Mr. Davidson.  (ECF No. 47-3 at 14).  Plaintiff, standing approximately ten to fifteen feet away, "didn't hear the comment," and later learned of it from Mr. Davidson.  (ECF No. 47-3

18

at 21–22).  Plaintiff does not suggest, nor does the record reflect, that the statement was about Plaintiff, made in his presence, or was otherwise directed at him.  As such, the impact of this second-hand harassment, for purposes of determining if the harassment was objectively hostile or abusive, is not as great as that of harassment directed at Plaintiff.

Plaintiff principally relies *on Spriggs* to demonstrate the severity of Mr. Peach's use of the word "nigger"; however, such reliance is unavailing.  To be sure, the Court agrees with the principles laid out in *Spriggs*:

> Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African–Americans.  "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."

242 F.3d at 185 (citation omitted).  Based on this, Plaintiff attempts to impose Title VII liability for a lone instance where a co-worker used the word "nigger" in the workplace.  However, the facts of *Spriggs* differ greatly than what exists in the record here.  There, the plaintiff "was exposed on a 'continuous daily' basis to [his supervisor's] racist comments concerning African Americans in general." *Spriggs*, 242 F.3d at 184.  The supervisor in *Spriggs* "habitually called [the plaintiff] a 'monkey,' 'dumb monkey,' and 'nigger.'" *Id.* at 182.  Even on these condensed facts, it is not difficult to understand how such racially animated harassment led to a conclusion that a reasonable jury examining the totality of the circumstances could find that a hostile work environment existed. *Id.* at 186.  Yet, there exist two palpable differences here.  Mr. Peach is not Plaintiff's supervisor who used various unambiguously racial epithet in Plaintiff's or Plaintiff's co-worker's presence. And, here, at most, there are three total instances: all of which occurred outside Plaintiff's presence.  To be deemed objectively pervasive, the harassment "must be more than episodic; [it] must be sufficiently continuous and concerted." *Faragher*, 524 U.S. at 787 n.1 (quotation

omitted).  Despite the odious nature of these various remarks, given the remoteness in time, these instances fail to adequately support Plaintiff's claim of a hostile work environment.

 To be sure, Plaintiff does not argue the perceived harassment was "physically threatening or humiliating," or that it "unreasonably interfere[d] with [Plaintiff's] work performance."  *Harris*, 510 U.S. at 23.  In fact, Plaintiff "hardly worked with [Mr.] Peach," and to Plaintiff, Mr. Peach was cordial.  (ECF No. 47-3 at 14).  Plaintiff conceded that Mr. Peach did not express any hostility toward him.  *Id.*  Therefore, these factors weight against a finding that the workplace was objectively abusive.

The Court discussed, *supra*, how the remainder of Plaintiff's hostile environment claim hinged on various allegations during his tenure with DPW: (1) that Plaintiff was not provided with overtime opportunities by Defendant Eastland; (2) that Plaintiff was not promoted to the MEO III position; (3) that Plaintiff was forced to work in unsafe conditions; (4) that Plaintiff was directed to singlehandedly complete tasks ordinarily reserved for two people; and (5) that Plaintiff received his work assignments last.  While the Court already determined same were not satisfactorily shown to be "because of" Plaintiff's race, these events are also temporally remote from each other.  Thus, this challenged conduct, too, would be insufficiently severe or pervasive to create a hostile or abusive work environment as a matter of law, it they had been shown to be founded in racial animus.

This case presents circumstances which can best be attributed to "personality conflict[s] with [one's] supervisor," and isolated incidents of repugnant language.  *Perkins*, 936 F.3d at 208 (citation omitted).  In sum, "courts usually only allow hostile work environment claims to proceed where the discriminatory abuse is near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance."  *Tawwaab*, 729 F. Supp. 2d at 777; *see also id*.

(noting that courts in this "Circuit typically grant summary judgment where many of these factors are missing, such that the abuse plaintiff alleges created a hostile work environment is not particularly frequent, threatening in nature, or disruptive to his ability to perform his work responsibilities").  In the absence of these conditions here, Plaintiff's hostile work environment claims must fail.  Nevertheless, the Court turns to the final factor.

4.      Basis for Imposing Liability

The fourth element of a hostile work environment claim requires that there be a basis for imputing liability to the employer.  *Strothers*, 895 F.3d at 332 (citing *Boyer-Liberto*, 786 F.3d at 278).  Different standards exist when evaluating the conduct of a co-worker or supervisor.  "If the harasser is a co-worker, then the employee must show that the employer was 'negligent in controlling working conditions'—that is, the employer 'knew or should have known about the harassment and failed to take effective action to stop it.'"  *Id.* at 332 (citations omitted).  The employer must "respond with remedial action reasonably calculated to end the harassment." *Sunbelt Rentals*, 521 F.3d at 319.  An employer's "remedial action that effectively stops the harassment will be deemed adequate as a matter of law."  *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 670 (4th Cir. 2011).  "[S]o long as discipline is reasonably calculated to end the behavior, the exact disciplinary actions lie within [the employer's] discretion."  *Bazemore v. Best Buy*, 957 F.3d 195, 202 (4th Cir. 2020); *see also DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quotation omitted) (noting that courts do "not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . .").

"If the harasser is a supervisor, then the employer may be either strictly or vicariously liable for the supervisor's actions."  *Id.* at 333 (citation and footnote omitted).  Under Title VII, a

"supervisor," for purposes of imputing liability, is an individual who is empowered "to take tangible employment actions against the victim, i.e., to [a]ffect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  An employer "may avoid strict liability for a supervisor's harassment where no adverse employment action was taken against the employee and the employer can demonstrate that (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior and (2) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer." *Sheikh v. 7–Eleven, Inc.*, Civ. No. AW–03–2270, 2004 WL 3584088, at *7 (D. Md. Dec. 17, 2004).

The Court concludes that, with respect to the harassment caused by Mr. Peach, Defendants responded with remedial action reasonably calculated to end the conduct—i.e., Mr. Peach's use of racially offensive language.  When Plaintiff became aware of the March 9, 2016 remark, he quickly reported the incident to Mr. North, who in turn advised Mr. Copper.  (ECF No. 47-3 at 21).  Mr. Copper counseled Mr. Peach and gave him an oral reprimand, advising that such language was not tolerated within the DPW or in Caroline County.  (ECF No. 47-6 at 7).  The record does not reflect subsequent harassment by Mr. Peach; therefore, Defendant's remedial action is adequate as a matter of law.  And, for the reasons described above, Defendant Eastland's conduct cannot be said to be "because of" Plaintiff's race, or be so severe or pervasive as to trigger the protections of Title VII.  Therefore, in this context, Defendant Eastland's conduct is not imputable to the County.

Accordingly, Defendants are entitled to judgment as a matter of law on Counts I, II, and IX.

**B.      Equal Protection (Counts VII and XI)**

Plaintiff's equal protection claims arising under § 1983 (Count VII against Defendants Eastland and County) and the Maryland Declaration of Rights (Count XI against Defendants Eastland and County) are governed by the foregoing analysis.  *See Weathersbee v. Baltimore City Fire Dept.*, 970 F. Supp. 2d 418, 430 (D. Md. 2013); *Beadsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (citation omitted) ("Courts may apply the standards developed in Title VII litigation to similar litigation under § 1983."); *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (citation omitted) (noting that the elements required to establish a case under Title VII, § 1981, and § 1983 "are the same under all three statutes").  Accordingly, given the Court's determination as to Plaintiff's hostile work environment claims, *supra*, his equal protection claims must also fail.

**C.      Title VII Race Discrimination (Count V)**

Finally, Defendants move for summary judgment on the failure-to-promote claim contained in Count V.  (ECF No. 47-1 at 32).  In support, Defendants contend the claim is time-barred for Plaintiff's failure to timely file an administrative charge with the EEOC.  *Id.*  Plaintiff "acknowledges that his failure[-]to[-]promote claim under Count V is time-barred."  (ECF No. 51 at 34).  Accordingly, Defendants are entitled to judgment as a matter of law on Count V.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 47) is GRANTED.  The Clerk is directed to CLOSE this case.  A separate order follows.


Date: August 10, 2021                                    _____/s/_____
                                                                          J. Mark Coulson
                                                                          United States Magistrate Judge